Peter J. YOUNGBLUT,
Appellee-Cross-Appellant,

v.

Woodrow L. WILSON and Patricia A. Wilson, Appellants-Cross-Appellees.

No. 63828.

Supreme Court of Iowa.

July 16, 1980.

Rehearing Denied Aug. 20, 1980.

Richard C. Turner, West Des Moines, for appellants-cross-appellees.

Jonathan C. Wilson and Steven L. Nelson, of Davis, Hockenberg, Wine, Brown & Koehn, Des Moines, for appellee-cross-appellant.

Considered by REES, P. J., and UHLENHOPP, McCORMICK, McGIVERIN and LARSON, JJ.

LARSON, Justice.

This appeal and cross-appeal arose out of the sale of farmland and its lease-back. The vendors, the Wilsons, appeal from a decree granting specific performance of the contract of sale and denying their attempt to forfeit the contract. The purchaser, Pe-

ter Youngblut, appeals from those portions of the decree denying him equitable and double rent for the Wilsons' holding over after the expiration of the lease and refusing to foreclose on the security for providing marketable title. We affirm the trial court.

In November, 1976, the Wilsons entered into an installment contract to purchase 2700 acres of land owned by parties named Harvey and Draper. The Wilsons took possession and put 900 acres in row crop, using the rest for a cattle-raising operation. Southern Iowa suffered drought conditions during the summer of 1977, which made it impossible for the Wilsons to meet their February 15, 1978, installment payment out of their own funds. This forced them to consider a short-term loan and the possibility of selling the farm. Word of their situation reached their neighbor Jim Woosley, who brought it to the attention of Leonard Youngblut and Harry Kenniston, realtors from Hudson with whom he had had dealings in the past.

In January, 1978, Leonard and Harry used Jim as a straw man in soliciting a 90-day option to buy the land. Mr. Wilson declined to grant him the option. A week later the three approached Wilson in an attempt to secure an exclusive real estate listing on the property. This attempt also failed. In March, 1978, the three approached Mr. Wilson with an offer from Peter Youngblut, Leonard's brother, to buy the land. The offer was to buy the land for $1,620,000 with a five per cent commission ($60,000) payable by the Wilsons. This offer, too, was refused.

The February 15, 1978, payment on the Harvey-Draper contract was not made, and the Wilsons were served with a notice of forfeiture on March 7. On April 6, Harry, Len, Jim, Peter and Wilson met in the realtors' office and negotiated the sale of the farm with a one-year lease-back agreement, which was necessary for Wilson to remain eligible for an S.B.A. disaster relief loan. The purchase price was increased by $60,000 and the commission agreement altered from five per cent of the purchase price to a flat $60,000. The contract provided for an immediate $100,000 payment (to be used to avoid forfeiture of the Harvey-Draper contract) with

Buyer . . . to pay the balance to Sellers at residence of Sellers, or as directed by Sellers, as follows:

A. $150,000 to be deposited in escrow with Youngblut Realty, and paid to Sellers at such time as Buyer is advised by Buyer's attorney that the abstract shows merchantable title [in accordance with Iowa Title Standards] in Sellers, which shall not be later than May 10, 1978.

The rest was to be paid in annual installments with a balloon payment due on February 15, 1988. The lease would run until February 1, 1979, and provided for rent of $135,000 due on the final day. It also provided that the Wilsons would receive ten percent of the gross profit on any resale of the property before February 15, 1988, or of the appreciation of the property up to that date. The lease also contained a compensation agreement, which provided that the $60,000 was payable "on the date the requirements of Paragraph 1, A [quoted above] of the Real Estate Contract . . are satisfied." A third instrument was executed in connection with the sale: an assignment of the Wilsons' interest in the Harvey-Draper contract to Peter as "a security agreement" which "would be null and void and of no further force and effect" when the Wilsons produced marketable title.

Also on April 6 phone calls were made from Youngblut Realty to the Decatur County Clerk of Court and the office of the attorney representing Ringgold Agricultural Services, Inc. to determine what liens, if any, existed. When Leonard went to the courthouse to file the assignment and the sale contract on April 10, he found that a $33,390.08 judgment lien in favor of Ringgold Ag and a $76,380.42 mechanics lien in favor of W. R. Grace & Co. had been filed earlier that day. On May 8, Youngblut Realty was served a Notice of Garnishment in connection with the Ringgold Ag judgment. It turned out that the property taxes were also delinquent.

Subsequent contact with Wilson revealed he desired to contest the W. R. Grace claim. Therefore, Peter's attorney proposed that the following disbursements be made from the escrowed funds at the May 10 closing:

| | | |
|---|---|---|
| (1) | Youngblut Realty, Inc. (commission) | $60,000.00 |
| (2) | Charles Elsen (abstracting) | $ 185.00 |
| (3) | Leo Baker (document drafting) | $ 617.50 |
| (4) | Black Hawk County Sheriff (garnishment) | $34,411.14 |
| (5) | Decatur County Treasurer (delinquent taxes) | $ 5,989.42 |
| (6) | Peter's lawyer's trust account | $48,796.94 |

The lawyer called Mr. Wilson to secure approval of the proposed disbursements. After being apprised of the proposal, Mr. Wilson only said, "Why don't you come and take everything I have?" and hung up without approving or disapproving the payments. The source of his disgruntlement appears to have been his need of the cash for upcoming operating expenses.

The disbursements were made as proposed, clearing all but the W. R. Grace lien from the title. The relationship between the parties deteriorated quickly. On June 22 the Wilsons' attorney contacted Youngblut Realty

> to give notice to you, the proposed Buyer's agent, that Mr. and Mrs. Wilson do not consider themselves bound by any supposed closing which has taken place in this matter and, further, Mr. and Mrs. Wilson consider the real estate contract between themselves and Peter J. Youngblut . . . as being void and of no legal effect.

On August 24, Peter filed his initial petition in this action seeking enforcement of the assignment of Wilson's equity or, in the alternative, specific performance of the contract. In September, notice of the March 1 termination of the tenancy, in conformity with chapter 562, was served on the Wilsons. In October they were served with a three-day notice to quit, which was ignored.

On December 4, the Wilsons served Peter with a notice of forfeiture of the contract based upon Peter's failure to make the $150,000 payment. Two days later they filed their answer and counterclaim reasserting that the contract was void or, in the alternative, forfeited. On January 4, 1979, they filed an Affidavit of Forfeiture. Late that same day a temporary restraining order against the filing of the affidavit was filed in Polk County; it was not filed in Decatur County until the next morning.

Trial commenced March 12. The trial court ruled the contract was not forfeited and ordered specific performance of it. It ordered the Wilsons to deposit a warranty deed in escrow and to make their title marketable by December 1, at which time the remainder of the escrowed funds would be released to them. Because the trial court decision was not rendered until May 15, well into the crop year, the trial judge fashioned an equitable change in possession. He granted the Wilsons an option to continue in possession of the land until February 1, 1980, at the same annual rent as provided in the original lease. He denied Peter's claim for "equitable" rent from February 1 to March 1, 1979, and for statutory double rent, see § 562.2, The Code 1977, because there was "no evidence from which the Court can ascertain the fair rental value of the farm on a per diem basis during [that] period . . . and it not being demonstrated that their occupancy has been willful. . . ."

Four issues must be considered in resolving this appeal:

(1) Should Peter be denied specific performance of the real estate agreement because he comes into court with unclean hands?

(2) Are the Wilsons entitled to forfeiture of the real estate contract?

(3) Are the Wilsons liable for equitable and double rent for the period they retained possession after the termination date on the lease?

(4) Should the trial court have granted a foreclosure on the assignment of the Harvey-Draper contract?

Since this controversy was tried below in equity, our review is de novo, although we give weight to the findings of fact of the trial court. Iowa R. App. P. 14(f)(7).

I. *Specific Performance.* Specific performance of a contract is not a remedy which is available as a matter of right; rather, its availability rests in the sound discretion of the court. *Incorporated Town of Wahpeton v. Rocklin,* 254 Iowa 948, 953, 119 N.W.2d 880, 883 (1963). It will not be granted where to do so would result in hardship or injustice, *Clayburg v. Whitt,* 171 N.W.2d 623, 631 (Iowa 1969), and any inequitable conduct on the part of the plaintiff will justify its denial. *Id.* at 631–32; *Incorporated Town of Wahpeton v. Rocklin,* 254 Iowa at 955, 119 N.W.2d at 884. Thus, the remedy is not available to one who is in default on the contract. *Tschirgi v. Merchants National Bank,* 253 Iowa 682, 686, 113 N.W.2d 226, 228 (1962). However, where the seller has contracted to convey clear title, tender of the purchase price less the amounts necessary to satisfy outstanding liens is sufficient performance to permit specific performance for the buyer. *Clinton v. Shugart,* 126 Iowa 179, 187, 101 N.W. 785, 789 (1904).

The Wilsons argue variously that Peter should be denied specific performance because (1) he is in default for failing to pay the $150,000 to them, (2) his approval of the disbursements was wrongful and the disbursements by the realtors are directly attributable to him because they were his agents and (3) an understanding that Youngblut Realty would represent Peter in resale of the land was in conflict with the realtors' fiduciary duty to the Wilsons and Peter's knowledge of that conflict of interest precludes his obtaining summary judgment. Peter counters that he fulfilled his contractual duty by paying the money into the escrow and that the Wilsons cannot complain about any subsequent disbursements because the realtors were their agents. He also argues that he is not in default because his duty to pay the $150,000 does not arise until such time as the Wilsons have provided marketable title.

Peter argues that he cannot be in default because the Wilsons have yet to provide marketable title. This argument is premised on analogy to the general rule

that "[d]elivery of the deeds and payment of the purchase price [are] to be concurrent, and neither party [can] put the other in default without tendering unconditional performance." *Webb v. Hancher,* 127 Iowa 269, 274–75, 102 N.W. 1127, 1129 (1905). However, the contract under dispute clearly departs from the general rule, making payment of the money into escrow and providing clear title independent acts to be performed by the parties at separate times. The Wilsons' contractual duty to provide clear title was not intended to trigger Peter's duty to make the down payment; that payment was already to have been made. Providing clear title was the event which would trigger the escrow agent's duty to release the funds to the Wilsons. *See* 28 Am.Jur.2d *Escrow* § 21 (1966). Since Peter's tender and the Wilsons' obligation to clear title were not concurrent, the W. R. Grace encumbrance would not preclude Peter from being in default.

It is not necessary to determine on whose behalf these realtors were acting. It is immaterial whose agents they were for the purpose of the real estate transaction because for purposes of the escrow arrangement they were the agents of both parties. 28 Am.Jur.2d *Escrow* § 11 (1966). Thus, any breach of the escrow agreement by the realtors cannot be attributed to either party. Peter fulfilled his contractual duty when he placed the money in escrow. There may be circumstances where one party has such control over the escrow agent that the agent's actions may be attributable to the party. However, we do not find such circumstances here. Peter's contractual duties were to pay $100,000 directly to the Wilsons and place $150,000 in escrow with Youngblut Realty. He fulfilled those duties completely.

The Wilsons' argument that the realtors' understanding that they would handle any resale of the farm for Peter created a conflict of interest for the realtors is based on *Brown & Co. v. Cash,* 165 Iowa 221, 145 N.W. 80 (1914). *Cash* is clearly distinguishable in that it involved covert self-dealing by realtors in concert with the

third party buyer. Such self-dealing is a breach of a realtor's obligation to his client, and makes him liable to account for profits incurred upon resale. *Id.* at 224, 145 N.W. at 83–84. By contrast, commissions from resale are for services rendered and would not be themselves an interest in the property. Thus, this understanding did not a create a conflict of interest for the realtors.

II. *Forfeiture.* A vendor in default cannot forfeit his contract. *Skubal v. Meeker,* 279 N.W.2d 23, 26 (Iowa 1979). The question of the Wilsons' default involves whether they have provided "merchantable title in accordance with Iowa Title Standards," as required by the real estate contract. The Wilsons cite several of our cases for the proposition that encumbrances for less than the outstanding purchase price do not make title unmerchantable. However, his contractual obligation was not to provide on May 10 title that was merchantable according to the common law; it was to provide merchantable title according to the Iowa Title Standards. Standard 1.1 requires not only that title be marketable under the common law but also that it be "subject to no other encumbrances than those expressly provided for by the client's contract." The Wilsons did not provide that title and were therefore precluded from forfeiting the contract.

III. *Rent.* Peter's appeal asks for rent at the previous rate for the period from February 1 to March 1 and double rent for the time after March 1. Since the trial court award included the February 1 to March 1 amount, we do not address it.

The request for double rent relies on section 562.2:

A tenant giving notice of his intention to quit leased premises at a time named, and holding over after such time, and a tenant or his assignee willfully holding over after the term, and after a notice to quit, shall pay double the rental value thereof during the time he holds over to the person entitled thereto.

The term willfully, in this context, has been construed "to mean intentionally, deliberately, with bad or evil purpose, contrary to

known duty. . . . [T]he term include[s] the disregard of the rights of others knowingly and with a stubborn purpose, or contrary to a known duty or without authority, and careless whether he have a right or not." *Nelson v. Deering Implement Co.,* 241 Iowa 1248, 1256–57, 42 N.W.2d 522, 527 (1950) (citations omitted).

The record does not support a finding that the Wilsons' holding over was willful. At the termination of the lease they were asserting ownership of the land under alternative theories that the sale contract was void or had been forfeited. Such a steadfast assertion of one's own rights is not in disregard of the rights of others or contrary to a known duty and without authority. However, we need not rely on the lack of willfulness, for our review of the record reveals that a necessary predicate for double rent is absent: Youngblut has made no showing that the Wilsons had been served, after the termination of the lease, with a notice to quit as required by section 562.2.

IV. *Foreclosure of Assignment.*

Trial court did not grant Youngblut's demand for foreclosure of the collateral agreement by which the Wilsons assigned their equity under the contract with the Harveys and Drapers as security for their duty to clear the property of liens. The court merely said it should continue as security for the obligations imposed upon them under the decree. We believe this is all the assignment could accomplish in any event; whatever real estate interest they had acquired from the Harveys and Drapers already stood as security for clearing liens. In other words, the assignment did not create any rights or obligations not already imposed by the contract. The trial court was correct in refusing to foreclose it.

We conclude the trial court correctly ruled upon all of the issues raised and affirm on both the appeal and cross-appeal.

AFFIRMED.