# IN THE SUPREME COURT OF IOWA

No. 18–0950

Filed February 7, 2020

**HOMELAND ENERGY SOLUTIONS, LLC,**

Appellee,

vs.

**STEVE J. RETTERATH,**

Appellant,

vs.

**JASON RETTERATH** and **ANNIE RETTERATH,**

Intervenors-Appellants,

and

PATRICK BOYLE, MAURICE HYDE, CHRISTINE MARCHAND, LESLIE HANSEN, CHAD KUHLERS, WALTER WENDLAND, MATTHEW DRISCOLL, EDWARD HATTEN, ROBERT SIERACKI, KEITH EASTMAN, STEPHEN EASTMAN, BARNEY RETTERATH, RANDY BRUESS, STEVEN CORE, NICK BOWDISH, and RSM US LLP (f/k/a McGLADREY LLP),

Third-Party Defendants.

---

Appeal from the Iowa District Court for Polk County, Carla Schemmel (trial and posttrial motions), Paul D. Scott (motions for summary judgment), Judges.

A defendant and the intervenors appeal a district court decision holding the defendant breached a contract. **DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

Jason W. Miller of Patterson Law Firm L.L.P., Des Moines, for appellants Jason Retterath and Annie Retterath.

William J. Miller and Kirk W. Schuler of Dorsey & Whitney LLP, Des Moines, David Hirsch of Harding Law Office, Des Moines, Brian J. Brislen and Adam R. Feeney of Lamson, Dugan & Murray, LLP, Omaha, Nebraska, and Allen H. Libow, Boca Raton, Florida, for appellant Steve J. Retterath.

Michael A. Dee and Brant D. Kahler of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellee.

**WIGGINS, Chief Justice.**

This is a breach of contract case involving the repurchase of all of a limited liability company's (LLC) member's membership interests (units). In June 2013, the member and the LLC executed an agreement where the LLC would buy back all of the member's units. Four days after the execution, the LLC's board approved the agreement. At no time did the LLC's membership vote to approve the agreement.

Five days after executing the agreement, the member attempted to revoke his offer to sell his units. The LLC countered that the member could not revoke because they had a binding agreement. The agreement indicated August 1, 2013, as the closing deadline, but the closing did not happen.

The LLC filed a breach of contract claim. It sought specific performance as the remedy as well as attorney fees under the breached contract. The member answered and included a jury demand, which the district court struck. Two other members of the LLC intervened. All three parties disputed whether membership approval of the agreement was required—the member and intervenors argued yes; the LLC argued no. The district court granted summary judgment in the LLC's favor on that issue.

Afterward, the member and the intervenors sought and the court allowed them to amend their pleadings. However, the district court bifurcated the trial, ordering that trial on the parties' original pleadings—i.e., the LLC's breach of contract claim and specific performance remedy, and the member's affirmative defenses to the agreement—would proceed as scheduled and postponed a trial on all claims arising from the amended pleadings.

Less than two weeks before trial, the LLC produced evidence that the member claimed the LLC had available previously and that he had requested during discovery. He requested the court sanction the LLC by excluding the documents or order a continuance to allow the member time to review the documents. The court denied this motion. After the bench trial, the district court allowed the LLC to supplement the record.

The court issued its ruling several months later, finding there was a binding agreement, holding the member breached the agreement, rejecting the member's affirmative defenses, and ordering the member's specific performance under the agreement. Later, it granted the LLC's request for attorney fees and denied the member's request for sanctions under Iowa Rule of Civil Procedure 1.413.

The member and the intervenors appealed. On appeal, we affirm the district court's striking of the jury demand, bifurcation of the issues for trial, determination that membership approval of the repurchase agreement is not required, denial of the member's motion for evidentiary sanctions or a continuance, determination the repurchases agreement was valid and binding, determination that the LLC is entitled to specific performance, and rejection of the member's affirmative defenses. We reverse the district court's award of attorney fees to the LLC, but affirm the denial of the member's request for rule 1.413 sanctions.

## I. Background Facts and Proceedings.

Homeland Energy Solutions, LLC (HES) is an Iowa limited liability company formed in 2006. It has approximately 1200 members, and its principal place of business is in Lawler, Iowa. Its ordinary business activities are producing and selling ethanol.

Steve Retterath grew up in Iowa but later moved to Florida, where he ran a successful construction crane business. He is a sophisticated

businessperson who admits to having spent forty-five years negotiating and executing multimillion-dollar contracts on tight deadlines.

In the 2000s, he invested several million dollars in three ethanol plants, one of which was HES. All three of these companies were formed as Iowa LLCs, and the interests in them were divided into units, which their members own. Retterath purchased 25,860 HES units for approximately $26 million during HES's initial offering of equity securities. This gave him the right to appoint two members to HES's board of directors. Until June 2013, he always occupied one of those seats. Retterath is HES's largest unitholder, owning roughly 28% of the units.

The intervenors, Jason and Annie Retterath, are Retterath's son and daughter-in-law. They own approximately 4% of HES's units and were voting members of HES at all times relevant to this appeal.

In late 2012, Retterath began efforts to liquidate his investments in the three ethanol companies. He successfully negotiated for the other two companies to repurchase his membership interests in 2012. In both instances, the company and Retterath executed member unit repurchase agreements (MURAs), which are substantially similar to the MURA at issue in this case.

At the December 19, 2012 HES board meeting, Retterath informed the board of an offer from Flint Hills Resources to purchase all of his HES units. He indicated that he wanted HES to have the first shot at buying his shares. The board, without Retterath, discussed the possible repurchase and created a buyback committee to negotiate the repurchase of Retterath's units.

In early 2013, Retterath offered to sell his units to HES for $2000 per unit. Around that time, the approximate market value of HES units was $1000 per unit. The buyback committee rejected Retterath's offer.

In February 2013, Retterath lowered his asking price to $1400 per unit. The buyback committee met on February 14 and counteroffered to repurchase Retterath's units for $28 million total. Retterath did not accept this counteroffer or make another counteroffer. Afterward, negotiations stalled.

Around this time, relations between Retterath, HES employees, and HES board members broke down. Both Retterath and one of his attorneys wrote emails and letters to HES management and the board, criticizing the board's actions and threatening litigation. Retterath suggested several individuals who were friendly to his interests to the board's nominating committee, which vets possible candidates for election to the board and then releases a list of candidates for the membership's vote. And in May 2013, Retterath gave another board member a $100,000 check to entice him to vote with Retterath on board matters.[1] HES's board launched a bribery investigation following Retterath's conduct.

In early June, Retterath initiated another round of negotiations by having an intermediary, Ed Hatten, inform several board members that Retterath would be willing to sell his units for $1100 per unit, payable in three annual installments. On June 10, the buyback committee agreed to offer Retterath $1100 per unit, payable in three annual installments, but noted the offer was subject to board and lender approval. On June 11, Pat Boyle, who was a member of the buyback committee as well as chairperson of HES's board at the time, emailed the offer in the form of a draft MURA to Retterath with a deadline of noon on June 13, 2013, for Retterath to sign and return the agreement.

---

[1]Retterath disputes this, but we do not find the evidence in his favor credible or persuasive. Similarly, in its ruling after trial, the district court also appears to have not found Retterath's explanation credible.

On June 12, Retterath replied to Boyle's email with two attachments. The first attachment provided Retterath's version of events regarding the alleged bribery. In the second attachment, Retterath expressed his concern with an installment plan if HES wanted "an unsecured promissory note which looks like [it] can borrow money while [it] owe[s Retterath] money" and for Retterath to hold it harmless. Instead, Retterath offered to agree to holding HES harmless if HES paid him in one lump sum.

On June 13, at 9:47 a.m., Boyle emailed a revised MURA under which HES would pay Retterath $1100 per unit (or $28,446,000 total) in one lump sum due at closing. The email instructed Retterath that, if the revised MURA was acceptable, to sign and return it by noon that day. At 10:46 a.m., Retterath replied to Boyle's email with an attached copy of the revised MURA wherein he had crossed out the $28,446,000 number and handwritten in "$30,000,000," initialed the change, initialed each page, and signed on the signature line.

The buyback committee met at 11:30 a.m. to discuss Retterath's counteroffer and agreed to it. The committee authorized Boyle to accept the counteroffer "of $30 million if he is unsuccessful in negotiating with [Retterath] to accept a payment of $15 million upon closing and another $15 million in a year." But the committee's meeting minutes indicate the agreement would still require board and lender approval.

Boyle immediately called Retterath and informed him of the committee's preference of the $30 million payment made in two installments. Retterath agreed. At 12:35 p.m., Boyle emailed Retterath the new MURA with the $30 million total payment, paid in two installments, one due at closing and the other by July 1, 2014. Paragraph 1 of the new MURA included in all caps, bold letters a notice that the

agreement would be null and void and no longer binding if not signed by Retterath and delivered to HES prior to 2:00 p.m. local time on June 13, 2013. Boyle also signed his name on the signature line on the last page. Retterath signed the new MURA and emailed it back to Boyle at 1:58 p.m.

At 4:18 p.m. that day, Boyle emailed the board, including Retterath, to inform them that the committee had come to an agreement to purchase Retterath's units "pending final board and bank approval." He attached a copy of the fully signed MURA for the board's review "to be voted on at the next board meeting."

Also around that time, Boyle, the board's chairman, and HES's CEO/president made inquiries regarding financing for the buyback from Home Federal Savings Bank (HFSB), the bank where HES had its revolving line of credit. On June 17, an officer from HFSB informed them that they would need to amend HES's Master Loan Agreement (MLA) to allow for the buyback and to get bank group approval.

Also on June 17, Retterath emailed Boyle, submitting his immediate resignation from the board and stating, "I retire from HES board and Ed Hatten will replace me." Consistent with this resignation, Hatten attended and participated in the board meeting on June 19, but Retterath did not. Retterath has not attended nor attempted to attend any subsequent board meetings. At the June 19 board meeting, the board approved the MURA in an 8–3 vote.

On June 18, the day before the board meeting where the board considered and approved the MURA, Retterath's attorney contacted HES's accountant regarding the tax ramifications of the buyback. In a phone call on June 20, HES's accountant informed Retterath's attorney that Retterath's gain from the sale of his units would be taxed as ordinary

income, not as capital gains, meaning that income would be taxed at a much higher rate.

At 6:15 p.m. that day, Retterath's attorney emailed HES's attorney, stating that Retterath's June 13 offer to sell his units back to HES "will expire upon delivery of this email ab initio." Retterath's attorney requested HES's attorney prepare for his review "a complete agreement with available and achievable terms for negotiation and execution" but stated that, otherwise, Retterath's June 13 offer "is hereby revoked." At 7:41 p.m., HES's attorney replied, stating that they had a signed agreement, not an offer to sell, and that HES was "clearing its contingencies and expect[ed] to close by the closing date of August 1st provided it [could] clear or waive its contingencies." In a subsequent email from June 21, HES's attorney again emphasized that HES and Retterath entered into a binding contract that was approved by HES's board and that Retterath was expected to honor.

On the morning of June 21, Retterath spoke with one of HES's board members and expressed his unhappiness regarding the MURA because he would now have to pay 40% tax. That board member passed along Retterath's complaints in an email to HES's CEO/president sent that same day. Throughout the summer, Retterath continued to express his opinion that there was no agreement to sell because he had revoked his offer.

During the summer, HES attempted to comply with its conditions and obligations under the MURA. On July 9, HES's attorney emailed Retterath's attorney a proposed mutual release, asking if he had any suggested changes, but neither Retterath nor his attorney responded. On July 16, 18, 22, 24, and 26, HES's attorney sent Retterath's attorney a series of emails and letters (1) stating HES was ready, willing, and able to close on the MURA; (2) stating the mutual release agreement needed to be

completed and requesting proposed revisions; (3) requesting Retterath's wiring instructions for the anticipated August 1, 2013 payment; (4) requesting copies of Retterath's units certificates and confirmation that the originals would be provided at closing; and (5) inquiring about the status of the written resignations of Retterath's board appointees and offering to draft them. Retterath never provided any of this information.

HES also secured financing to cover the August 1 installment payment and lender approval to repurchase the units. As of July 1, 2013, the bank had prepared all of the loan agreements its attorney believed necessary to get the approval and proceed with the buyback. HES's plan was to use its revolving line of credit to pay Retterath, then HES would take out an additional term loan to pay off the revolving line of credit. In a July 12 communication, HFSB offered to lend HES up to $35,000,000— $15 million in a new term loan and $20 million on HES's existing revolving line of credit—which HES accepted.

As part of obtaining lender approval and acting in compliance with its operating agreement, HES needed to amend its MLA with HFSB because the MLA did not allow HES to purchase or otherwise acquire any of its units without prior written consent from HFSB. During this time, HES took steps to amend the MLA but did not actually do so before the August 1 closing deadline.

The closing scheduled for August 1 did not happen. On August 14, HES filed its petition in equity against Retterath. It alleged Retterath breached the MURA by failing to perform his obligations, and it requested specific performance as the remedy. It also alleged the MURA's indemnification clause allowed for an award of attorney fees and requested the court order Retterath reimburse HES for the attorney fees and costs resulting from Retterath's breach.

In his answer, Retterath raised several affirmative defenses. He also included a jury demand for all issues triable by a jury, which HES moved to strike. On November 13, 2014, the district court granted HES's motion to strike Retterath's jury demand.

On February 18, 2015, HES filed a motion for summary judgment, asking the court to find that Retterath breached the MURA and to order him to specifically perform his obligations under the MURA. HES argued it was entitled to summary judgment because section 5.6(b)(v) of the operating agreement did not apply to the MURA and, therefore, no membership vote was required to ratify the MURA. In a March 18 filing, HES indicated its motion for summary judgment was in actuality a partial motion for summary judgment and was limited to the issue of "whether the HES Operating Agreement requires a member vote to approve the [MURA]."

On March 4, Jason and Annie Retterath moved to intervene, which the court allowed on April 16. In their "Petition in Intervention," the intervenors raised five claims: (1) temporary injunctive relief; (2) permanent injunctive relief; (3) declaratory relief; (4) conversion; and (5) breach of contract, i.e., breach of HES's operating agreement section 5.6.

On June 1, the intervenors filed their motion for partial summary judgment. They claimed there was no genuine issue of material fact regarding whether HES violated its operating agreement by its conduct involving the MURA, and therefore, they were entitled to summary judgment on their permanent injunction and declaratory relief claims and on the breach element of their breach of contract claim.

Retterath also filed his motion for summary judgment on June 1. He claimed the MURA could not be performed because doing so would

violate the HES members' voting rights in HES's operating agreement. He argued that the MURA is void and unenforceable because it lacked membership approval and because HES did not have the power or authority to enter into the transaction with Retterath. He also argued that HES could not waive compliance with the membership voting requirement in its operating agreement.

On October 16, the district court granted HES's motion for summary judgment and denied Retterath's and the intervenors' motions for summary judgment. Retterath and the intervenors filed separate rule 1.904(2) motions.

The court granted Retterath's and the intervenors' rule 1.904 motions on December 8. In that order, it limited its summary judgment order to the conclusion that the member approval requirement of section 5.6(b)(v) of the operating agreement did not apply to the MURA and, therefore, no membership vote was required to ratify the MURA. It further modified its summary judgment ruling to eliminate the conclusion that HES satisfied all of the elements of its breach of contract claim and the order of specific performance. It stated the case of HES versus Retterath would proceed to trial on the remaining issues, i.e., Retterath's affirmative defenses, whether HES established its breach of contract claim, and whether HES was entitled to specific performance.

Additionally, the court clarified that its summary judgment ruling adjudicated the intervenors' permanent injunction, declaratory relief, and breach of contract claims. The court also sua sponte took up the intervenors' temporary injunction and conversion claims based on the intervenors' rule 1.904 motion and concluded those claims should be dismissed for the reasons provided in the summary judgment ruling. It thereby dismissed all five of the intervenors' claims.

On July 21, 2016, Retterath and the intervenors moved for leave to amend their pleadings. HES filed resistances to both motions on August 3. In the alternative, HES requested that if the court granted Retterath's and the intervenors' motions, that the court bifurcate the new claims and parties so trial on HES's cause of action for specific performance could proceed as scheduled on January 17, 2017.

On August 4, 2016, the district court granted Retterath's and the intervenors' motions. In its orders, the court stated that the motions were unresisted, and it, therefore, did not address HES's alternative request to bifurcate.

On August 9, Retterath filed his amended answer, counterclaims, and third-party claims and the intervenors filed their third amended petition in intervention. Both filings were accompanied by a jury demand for all issues triable to a jury. In his amended answer, Retterath raised additional affirmative defenses. He also raised several counterclaims against HES and third-party claims against the directors of HES, HES's CEO/president, and an LLP that provided Retterath and HES with accounting services. In their newly amended petition in intervention, the intervenors raised additional claims against HES and new claims against HES's directors and CEO/president.

Also on August 9, HES filed a motion to reconsider the order granting Retterath's and the intervenors' motions for leave to amend. Following a reported hearing, the district court ruled, on November 6, that the order granting the motions to amend the pleadings would stand. However, it bifurcated the trial, ruling that trial would proceed as scheduled on January 17, 2017, but would be limited only to issues raised in HES's original petition and in answers thereto. It prohibited any discovery on the amended portions of Retterath's and the intervenors'

pleadings from taking place before the district court's ruling relating to HES's original petition. In relevant part, the court stated that it was its "intent to try this matter in January, limited to evidence related [to] the claims raised originally by [HES], in the reasonable hope that this would provide global resolution." It further explained,

> The court concludes it is in the best interests of judicial economy, and the parties, to keep all their related claims in one case. Likewise, it is in the parties' and the court's best interest to try the initial claims first, undelayed by ancillary discovery and proceedings attributable to the now amended pleadings of [Retterath] and [the] Intervenor[s], as that trial may be dispositive of the entire dispute.

On January 10, 2017, Retterath filed a motion for evidentiary sanctions against HES or, in the alternative, a continuance of trial. He claimed that HES had untimely produced documents requested in discovery and, therefore, that HES should be prohibited from using or eliciting testimony relating to those documents at the upcoming trial. Alternatively, he claimed that trial should be continued sixty to ninety days to allow Retterath and his expert witness sufficient time to review and analyze the documents and that he should have the opportunity to redepose witnesses regarding the documents.

At the pretrial conference hearing on January 13, the court addressed Retterath's motion. During the argument, HES's counsel declared that HES did not have any other responsive documents to produce and conceded that if it did and they showed up now, they would not come in at trial. The court denied Retterath's motion in full. It explained that it did not believe Retterath had made a sufficient showing of prejudice, that it found the request for production somewhat confusing, and that, in hindsight, some things were not addressed perhaps as soon

as they should have been.  It also reasoned that the case had been on the docket far longer than it was supposed to be and needed to get to trial.

The case proceeded to a bench trial beginning on January 17. Posttrial, the parties submitted designated depositions and accompanying exhibits into the record.  On February 17, HES moved to supplement the record with documents from HES's bank, which corroborated the trial testimony of HES's witnesses that HES's bank had approved and agreed to finance HES's payment obligation under the MURA.[2]  On March 28, the district court granted HES's motion to supplement.

On June 15, the court issued its ruling after trial.  It first found "that the MURA is a clear and unambiguous agreement for Retterath to resell his units to HES for a set amount on a set date, and that its terms are fair to both parties involved."  It then addressed and rejected the various affirmative defenses Retterath raised.  It concluded that HES's request for enforcement of the MURA should be granted and ordered Retterath to take

---

[2]It offered trial exhibit 62, which is an HES request form dated June 17, 2013, wherein HES sought approval from its bank to amend the MLA to allow for unit repurchases.  In the comment section is a note indicating HES planned "to fund the first $15 million installment [under the MURA] on the term revolver."  The form is signed by a loan officer and an approving officer.

It also offered trial exhibit 63, which is a copy of HES's "Term Revolving Draw Request (Term Revolving Loan)" dated August 1, 2013, wherein HES requested $8 million from its revolving loan (i.e., its line of credit) on August 1, 2013.  The request was signed by HES's chief financial officer, and it contains a handwritten "OK" next to the loan officer's signature.  There is a partially visible handwritten date next to the "OK" and loan officer's signature.  HES argued the date is "8-1-13," but the scanned copy cuts off, making it look like the first number could be an "8" or a "9" where the vertical line of the "9" did not come through on the scan.

Third, it offered trial exhibit 64, which is HES's business checking account statement for August 2013.  The statement indicates that on August 1, 2013, the account had an "Electronic Credit[]" in the amount of $8 million with the description of "Per Dave: Term Revolver Adv N-504626 SS."  The statement's detail summary showed that on August 1, 2013, HES's business checking account ranged between $17.4 million and $20.35 million throughout the day.

all necessary steps under the MURA to ensure that the MURA closes on or before August 1, 2017.

On June 30, Retterath filed a rule 1.904 motion regarding the court's ruling after trial as well as a motion for new trial in the alternative to his rule 1.904 motion. On August 7, HES filed its own rule 1.904 motion. It asked the court to correct certain clerical errors, to make a finding that HES is entitled to attorney fees pursuant to the MURA, and to make a finding that Retterath was not a director at the time the HES board voted to approve the MURA on June 19, 2013.

The court issued its ruling on posttrial motions. It denied Retterath's motion. The court granted in part and denied in part HES's motion. It granted HES's request to amend to correct clerical errors and denied the request that it find Retterath was not a director when the HES board voted to approve the MURA. Finally, it found that HES was entitled to attorney fees pursuant to the MURA but declined to determine the amount until all issues between the parties were resolved.

Retterath and the intervenors appealed. We retained the appeal.

**II.  Scope and Standards of Review.**

Whether a party is entitled to a jury trial is a legal question. *See Hedlund v. State*, 930 N.W.2d 707, 718 (Iowa 2019); *Weltzin v. Nail*, 618 N.W.2d 293, 296 (Iowa 2000) (en banc). Therefore, our review is for correction of errors at law. *See* Iowa R. App. P. 6.907; *Ramirez v. Iowa Dep't of Transp.*, 546 N.W.2d 629, 631 (Iowa Ct. App. 1996).

Bifurcation of a trial is a discretionary matter, which we review for an abuse of discretion. *See Meyer v. City of Des Moines*, 475 N.W.2d 181, 191 (Iowa 1991).

We review summary judgment rulings for correction of errors at law. *Hedlund*, 930 N.W.2d at 715. We review the summary judgment record in the light most favorable to the nonmoving party, "consider[ing] on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record." *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717–18 (Iowa 2001) (en banc). Our review is "limited to whether a genuine issue of material fact exists and whether the district court correctly applied the law." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 434 (Iowa 2008).

Likewise, our review of the district court's contract interpretation and construction is at law. *See Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011). In the contractual context,

> [i]nterpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect. Interpretation is reviewed as a legal issue unless it depended at the trial level on extrinsic evidence. Construction is always reviewed as a law issue.

*Id.* (quoting *Fashion Fabrics of Iowa, Inc. v. Retail Inv'rs Corp.*, 266 N.W.2d 22, 25 (Iowa 1978)). Here, the district court's interpretation of HES's operating agreement did not depend on extrinsic evidence.

We review rulings on evidentiary matters and evidentiary sanctions for abuse of discretion. *Jensen v. Sattler*, 696 N.W.2d 582, 589 (Iowa 2005).

HES's breach of contract claim and request for specific performance were tried in equity. Therefore, our standard of review is de novo. *Breitbach v. Christenson*, 541 N.W.2d 840, 843 (Iowa 1995) (en banc).

Rulings on motions for continuance and motions to reopen evidence are discretionary and are, therefore, reviewed for an abuse of discretion. *State v. Teeters*, 487 N.W.2d 346, 348 (Iowa 1992) (en banc).

Review of a district court's grant of attorney fees is for an abuse of discretion. *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 469 (Iowa 2010). Likewise, we review district court decisions on whether to impose sanctions under Iowa Rule of Civil Procedure 1.413 for abuse of discretion. *Barnhill v. Iowa Dist. Ct.*, 765 N.W.2d 267, 272 (Iowa 2009). In our review, we will correct erroneous applications of law. *NevadaCare*, 783 N.W.2d at 469; *Barnhill*, 765 N.W.2d at 272.

### III. Issues.

Retterath and the intervenors raise a myriad of issues on appeal. They are (1) whether the district court erred in striking Retterath's jury demand, (2) whether the court erred in bifurcating the issues for trial, (3) whether membership approval of the MURA was required under HES's operating agreement or Iowa law, (4) whether the court erred in denying Retterath's motion for evidentiary sanctions or a continuance, (5) whether the MURA is a valid and binding agreement, (6) whether HES is entitled to specific performance of the MURA, (7) whether the court erred in rejecting Retterath's affirmative defenses to the MURA, and (8) whether the court erred in awarding HES attorney fees and denying Retterath attorney fees.

### IV. Whether the District Court Erred in Striking Retterath's Jury Demand.

Retterath claims the district court erred in striking his jury demand in his original answer to HES's petition. We disagree.

"Generally, there is no right to a jury trial for cases brought in equity." *Hedlund*, 930 N.W.2d at 718. In determining whether a case is one in equity or at law, we look at the pleadings, relief sought, and essential nature of the cause of action. *Carstens v. Cent. Nat'l Bank & Tr. Co.*, 461 N.W.2d 331, 333 (Iowa 1990). However "the remedy sought is of minimal importance—it is the nature of the cause of action, *i.e.*, where the

case is properly docketed, that is the deciding factor." *Weltzin*, 618 N.W.2d at 297. Further, the commencement of an action in equity does not automatically deprive a party of the right to a trial by jury on "issues ordinarily triable to a jury." *Id.* (quoting *Carstens*, 461 N.W.2d at 333).

Here, the essential nature of HES's cause of action is legal because it is a breach of contract claim. *See Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 226 (Iowa 2017) (noting the action had become one at law, in part, because it was a contract dispute with each party alleging the existence of different contracts); *Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178 (Iowa 2010) ("Generally, an action on contract is treated as one at law." (quoting *Atlantic Veneer Corp. v. Sears*, 232 N.W.2d 499, 502 (Iowa 1975))).

We cannot, however, completely ignore the remedy sought or the pleadings. *See Carstens*, 461 N.W.2d at 333. In *Van Sloun*, we noted that when "both legal relief and equitable relief are demanded, the action is ordinarily classified according to what appears to be its primary purpose or its controlling issue." 778 N.W.2d at 179 (quoting *Mosebach v. Blythe*, 282 N.W.2d 755, 758 (Iowa Ct. App. 1979)). Although HES sought only equitable relief here, we can nevertheless consider the case's primary purpose or controlling issue for assistance. *See Berryhill v. Hatt*, 428 N.W.2d 647, 658 (Iowa 1988) (noting specific performance is an equitable remedy). Undoubtedly, HES's primary purpose in filing this breach of contract claim was to complete the extinguishment of Retterath's interest and influence in HES. As we determine below, damages are not an adequate remedy. And while breach of contract may be the identified cause of action, the controlling issue in this case is the proper remedy.

The district court correctly determined HES's claim should be tried in equity. Retterath "has no right to a trial by jury of law issues raised in

the answer to an action properly brought in equity." *In re Marriage of Stogdill*, 428 N.W.2d 667, 670 (Iowa 1988). The court did not err in striking Retterath's jury demand or in denying his motion for new trial on this basis.

**V. Whether the District Court Abused Its Discretion in Bifurcating the Issues for Trial.**

After the court allowed Retterath and the intervenors to amend their pleadings six months before trial, the district court bifurcated trial on the newly raised issues in the amended pleadings from trial on the issues raised in HES's petition and on Retterath's affirmative defenses thereto. Retterath and the intervenors both claim this was an abuse of discretion. We disagree.

Iowa Rule of Civil Procedure 1.914 permits the court to, "for convenience or to avoid prejudice, order a separate trial of any claim, counterclaim, cross-claim, cross-petition, or of any separate issue, or any number of them." Iowa R. Civ. P. 1.914. The district court bifurcated the issues to be tried, reasoning resolution of HES's specific performance claim and Retterath's defenses thereto "may well be dispositive of the entire dispute." We agree with the court's reasoning as all of Retterath's counterclaims against HES relate to or turn on the enforceability of the MURA. *See Westco Agronomy*, 909 N.W.2d at 227 ("We have several times expressed the view that the case which is most likely to dispose of the whole controversy should be tried first in order to avoid an unnecessary second trial." (quoting *Morningstar v. Myers*, 255 N.W.2d 159, 161 (Iowa 1977))). The court did not abuse its discretion in bifurcating the issues for trial.

We also find there is no merit to Retterath's or the intervenors' contentions that bifurcation was in error because both would have other

claims remaining against third-party defendants, RSM US LLP (f/k/a McGladrey LLP) and the HES board, and HES, respectively. Under Iowa Rule of Civil Procedure 1.953, the court is permitted to enter separate judgment at different times against separate parties. That rule provides,

> Where the action involves two or more parties, the court may, in its discretion, and though it has jurisdiction of them all, render judgment for or against some of them only, whenever the prevailing party would have been entitled thereto had the action involved the prevailing party alone, or whenever a several judgment is proper; leaving the action to proceed as to the other parties.

Iowa R. Civ. P. 1.953. Under that rule, the court is allowed to render judgment against Retterath on HES's specific performance claim and his defenses thereto regardless of any related claims Retterath might still have against RSM or HES's individual board members and officers (i.e., parties other than HES) and regardless of any claims the intervenors (i.e., parties other than HES or Retterath) have against HES. *See also id.* r. 1.456 ("Where judgment in the original case can be entered without prejudice to the rights in issue under a cross-petition, cross-claim or counterclaim, it shall not be delayed thereby.").

The intervenors cite to *In re Marriage of Thatcher*, where we appeared to limit rule 1.953 by stating that the court may not "enter serial final judgments at different times in a single action between two parties, except for collateral matters such as cost or fee awards." 864 N.W.2d 533, 540 (Iowa 2015). Therefore, according to the intervenors, the district court erred in purporting to enter a final judgment on the specific performance and affirmative defense parts of the case because it had not resolved the rest of the case between HES and Retterath.

The intervenors read too much into our statement in *Marriage of Thatcher*. Although we used the phrase "single action" in that case,

reading that language in context with the rest of that case's discussion indicates that phrase really meant "single cause of action." *See id.* at 539–40. Accordingly, our statement in *Marriage of Thatcher* should be read as meaning the rules of civil procedure do not allow district courts to enter serial final judgments at different times in a single *cause of* action between two parties. *See id.* at 540. That understanding of our statement in *Marriage of Thatcher* also accords with our caselaw holding

> [t]wo final orders are possible in a single case, one putting it beyond the power of the court to put the parties in their original positions in relation to a specific issue, and the other adjudicating remaining issues in the case.

*Lyon v. Willie,* 288 N.W.2d 884, 887 (Iowa 1980).

In *Lyon*, the plaintiffs filed for summary judgment on their petition's specific performance count and damages count. *Id.* at 886. The district court granted summary judgment on the specific performance count, ordering the defendant to turn over his stock to the plaintiffs so the plaintiffs could carry out the transfer of that stock to the third-party purchaser, but reserved the damages count for trial. *Id.* We held the partial summary judgment was a final judgment. *Id.* at 887.

"Ordinarily a final judgment conclusively adjudicates all the rights of the parties" and "[s]uch an adjudication puts it beyond the power of the court to place the parties in their original positions." *Id.* at 886. But "it is possible for an order to put it beyond the power of the court to return the parties to their original positions even though it does not conclusively adjudicate all the rights of the parties." *Id.* The partial summary judgment order in *Lyon* was such an order because, if the order were effectuated, the court would lack the authority, without a new lawsuit, to order the third-party purchaser to return the stock. *Id.* at 886–87. We held that in such

a situation, the requirement of full adjudication before appeal gave way and that two final judgments were possible in that single case.  *Id.* at 887.

In contrast, the bifurcated final judgments in *Marriage of Thatcher* adjudicated separate parts—(1) whether the marriage was dissolved and (2) the property distribution—of one cause of action—a petition for marriage dissolution.  864 N.W.2d at 539–40.  Moreover, *Marriage of Thatcher* is distinguishable from the instant case because we held in *Marriage of Thatcher* that an Iowa Code provision, which requires the division of property and the decree of dissolution be contemporaneous, superseded rules 1.914's and 1.953's bifurcation and separate judgments allowances; there is no analogous statute applicable in the instant case. *See id.*

The district court did not abuse its discretion in bifurcating the issues for trial.  Nor did the bifurcation lead to a procedural fallacy.

**VI. Whether Membership Approval of the MURA Was Required Under HES's Operating Agreement or Iowa Law.**

**A. Whether Membership Approval Is Required Under HES's Operating Agreement.**  Iowa law dictates that an LLC is bound by its operating agreement.  Iowa Code § 489.111(1) (2013).  At issue, here, is whether certain provisions of HES's operating agreement or public policy require membership approval of the MURA.

"The cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract."  *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011).  The language the parties used is the most important evidence of their intentions, and therefore, we endeavor to give effect to all language of the contract.  *Id.*; *NevadaCare*, 783 N.W.2d at 466.  But "[w]ords and other conduct are interpreted in the light of all the circumstances, and if the

principal purpose of the parties is ascertainable it is given great weight." *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (quoting Restatement (Second) of Contracts § 202(1), at 86 (Am. Law Inst. 1981)); *accord Pillsbury Co.*, 752 N.W.2d at 436.

We rely on the general rules of contract interpretation from the Restatement as guides in the process of interpretation. *Pillsbury Co.*, 752 N.W.2d at 436; *see* Restatement (Second) of Contracts § 202, at 86 (providing rules in aid of interpretation). "The rules do not depend on a determination that there is an ambiguity, but we use them to determine 'what meanings are reasonably possible as well as in choosing among possible meanings.'" *Pillsbury Co.*, 752 N.W.2d at 436 (quoting *Fausel*, 603 N.W.2d at 618).

Retterath and the intervenors first contend that section 5.6(b)(v) mandates membership approval of the MURA. Section 5.6 lays out the restrictions on the authority of HES's directors. It provides in relevant part,

> (b) The Directors shall not have authority to, and they covenant and agree that they shall not cause the Company to, without the consent of a majority of the Membership Voting Interests:
>
> . . . .
>
> (v) Cause the Company to acquire any equity or debt securities of any Director or any of its Affiliates, or otherwise make loans to any Director or any of its Affiliates.

Retterath and the intervenors argue that Retterath's units are "equity securities" under section 5.6(b)(v) and that section 5.6(b)(v) requires membership approval to acquire HES units. We disagree.

Another provision of the operating agreement specifically covers reacquisition of units. Section 5.16(vii) provides,

> Board committees may exercise only those aspects of the Directors' authority which are expressly conferred by the Directors by express resolution. Notwithstanding the foregoing, however, a committee may not, under any circumstances: . . . (vii) authorize or approve the *reacquisition* of Units, except according to a formula or method prescribed by the Directors . . . .

(Emphasis added.) This provision gives the directors the authority to authorize and approve reacquisition of member units without membership approval.

When considering section 5.6(b)(v) and section 5.16(vii) in conjunction, it does not make sense that the directors could reacquire any member's or director's units without membership approval under section 5.16 but would need membership approval to acquire any of the directors' HES units—i.e., equity securities in HES—under section 5.6(b)(v). *See, e.g., Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991) ("[W]hile words [of a contract] are to be given their ordinary meaning, particular words and phrases in a contract are not to be interpreted in isolation."). Accordingly, "acquire" as used in section 5.6(b)(v) cannot require membership approval when HES reacquires its units.

Retterath and the intervenors argue that section 5.16 is a general provision so it cannot limit section 5.6(b)(v), which is a specific provision. HES disagrees, arguing that the express and specific language of section 5.16 of the operating agreement grants the board of directors the sole authority for reacquiring a member's units.

One principle of contract construction is that "when a contract contains both general and specific provisions on a particular issue, the specific provisions are controlling." *Id.* at 863. Retterath and the intervenors contend that section 5.6(b)(v) is a specific provision because section 5.6(b)(v) is the only provision in the operating agreement that

dictates how HES—through its directors—may acquire any equity security of a director and because section 5.6 is the only provision that specifically applies to the authority of the directors. In contrast, they argue, section 5.16 is just one of many provisions that apply to members generally. We do not find these arguments persuasive.

First, other provisions of the operating agreement apply specifically to the authority of the directors. For example, section 5.4 provides a list of actions the directors are authorized to perform, section 5.5 allows the directors to authorize one director to act as the agent of HES, and section 5.16 authorizes the directors to create committees. Moreover, whether section 5.6(b)(v) is the only provision that specifically applies to the authority of the directors is not illuminating on whether the actual language used in section 5.6(b)(v) requires membership approval before HES may acquire a director's equity securities.

Second, section 5.6(b)(v) and section 5.16 are both specific and general in their own right. Section 5.6(b)(v) addresses the directors' authority to acquire any equity securities of a director—i.e., of a specific member—and section 5.16 addresses the authority of a committee created by the directors to reacquire any member's units—i.e., a specific type of equity security. Thus under Retterath and the intervenors' reasoning, different portions of each provision would control different portions of the other provision. Such a result does not make sense.

We agree with the district court that section 5.6(b)(v) only applies when HES is acquiring equity or debt securities other than its own units, and section 5.16 controls when HES acquires its own units.

Retterath next argues that section 4.1, and impliedly section 5.6(a)(ii), of the operating agreement require membership approval on the MURA. Section 4.1 authorizes the directors to make distributions "to the

Unit Holders in proportion to Units held." Section 5.6(a)(ii) prohibits the directors from "[k]nowingly engag[ing] in any act in contravention of this Agreement . . . , except as otherwise provided in this Agreement" without unanimous consent of the members.

Retterath argues that the two $15 million payments to him qualify as "liquidating distributions" and because HES is making a distribution solely to him and not the other HES members in proportion to units held, the directors are violating section 4.1. And therefore section 5.6(a)(ii) requires the directors to have unanimous membership consent in order to violate section 4.1.

This argument is unpersuasive because liquidating distributions are not the kind of distributions that section 4.1 contemplates. Section 4.1 specifically authorizes the directors to "make distributions of Net Cash Flow." The term "net cash flow" is defined in the operating agreement to mean

> the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements and contingencies, all as reasonably determined by the Directors. "Net Cash Flow" shall not be reduced by Depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions of reserves previously established.

The funds HES was to use to pay Retterath for his units were not a distribution of HES's net cash flow.

Moreover, the testimony of attorney Joseph Leo established "liquidating distribution" is a legal term used in the tax code. Nothing in section 4.1 of the operating agreement or in any other provision of the agreement indicates that the term "distribution" as used in section 4.1 is a technical, legal term or that, even though it is not a technical, legal term, it includes a specific, technical term used in tax law.

### B. Whether Membership Approval Is Required Under Iowa Law.

Retterath and the intervenors next claim that membership approval is required under Iowa common law and Iowa Code chapter 489. Retterath claims that Iowa Code section 489.407(3)(*d*)(3) required consent of all members before HES could approve the MURA because the MURA was outside HES's ordinary activities.

1. *Membership approval under Iowa Code section 489.407(3)(d)(3).* Section 489.407 provides in relevant part,

> 3. In a manager-managed limited liability company, all of the following rules apply:
>
> . . . .
>
> *d.* The consent of all members is required to do any of the following:
>
> . . . .
>
> (3) Undertake any other act outside the ordinary course of the company's activities.

Iowa Code § 489.407(3)(*d*)(3). Retterath and the intervenors argue that HES's actions regarding the MURA were outside the ordinary course of HES's activities. However, neither indicates what the ordinary course of HES's activities is nor otherwise provides any argument regarding why MURA-related actions are outside of the ordinary course of HES's activities. Nor does either provide any record or legal citations, indicating negotiating, preparing, and executing a repurchase agreement is beyond an LLC's ordinary course of activities. Based on the lack of argument on this issue, it is waived on appeal. Iowa R. App. P. 6.903(2)(*g*).

Nevertheless, even if it has not been waived, the operating agreement suggests actions related to a repurchase agreement are not outside HES's ordinary course of activities. For example, section 1.3 of the operating

agreement details the purposes and powers of HES and provides in relevant part,

> The nature of the business and purposes of the Company are to: . . . (iii) engage in any other business and *investment activity* in which an Iowa limited liability company may lawfully be engaged, as determined by the Directors. The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to, and in furtherance of, the purposes of the Company . . . .

(Emphasis added.) Repurchasing a member's units in the LLC is analogous to engaging in transactions for interest in an LLC, which is an investment activity in which an Iowa LLC may engage. Section 5.4 of the operating agreement details ways in which HES directors may engage in transactions. Section 5.4(a) enumerates actions the directors are authorized to perform, including conducting HES's business, carrying on HES's operations, and having and exercising the powers granted by Iowa Code chapter 489 to effect the purposes for which HES is organized. Section 5.4(b) authorizes directors to "[a]cquire by purchase, lease or otherwise . . . personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company." Section 5.4(d) allows directors to execute agreements and contracts in connection with the management, maintenance, and operation of HES's business and affairs. Section 5.4(j) permits directors to carry out contracts necessary to, incidental to, or connected with the purposes of HES as may be lawfully performed by an LLC under Iowa law. And section 5.4(k) authorizes taking or not taking actions "not expressly proscribed or limited by this Agreement or the Articles" to accomplish HES's purposes.

2. *Membership approval required because only a principal can ratify the unauthorized act of an agent under Iowa law.* Between June 11 and June 13, 2013, the chairman of HES's board of directors emailed Retterath

three versions of a draft MURA. On June 13, the chairman presigned and emailed Retterath what would be the final draft of the MURA. Retterath signed that draft. However, the board had not authorized the chairperson to sign the MURA at the time he did. On June 19, the board ratified the MURA and approved the chairman's signature.

The intervenors argue that the board could not ratify the unauthorized acts of an agent—the June 11 offer and the chairman's acts on June 13—because the board was not the principal but, rather, the members are the principal. Under Iowa Code section 489.110,

> The operating agreement may specify the method by which a specific act or transaction that would otherwise violate the duty of loyalty may be authorized or ratified by one or more disinterested and independent persons after full disclosure of all material facts.

Iowa Code § 489.110(5). The intervenors argue that the directors causing HES to acquire a director's equity securities in HES qualifies as insider or self-dealing, which Iowa law has indicated violates the duty of loyalty. *Cf. Rowedder ex rel. Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 452 (Iowa 1988) ("Corporate directors and officers may under proper circumstances transact business with the corporation including the purchase or sale of property, but it must be done in the strictest good faith and with full disclosure of the facts to, and the consent of, all concerned." (quoting *Des Moines Bank & Tr. Co. v. George M. Bechtel & Co.*, 243 Iowa 1007, 1081, 51 N.W.2d 174, 216 (1952))); *Harvey v. Leonard*, 268 N.W.2d 504, 512 (Iowa 1978) (noting general rule that "trustees are prohibited from engaging in self-dealing transactions with the trust and from obtaining personal advantage from their dealings with trust property" and holding that trustee breached his duty of loyalty to the trust when he accepted stock issued to him, knowing that a consequence

of such was to reduce the trust's control of the company that issued the stock). They contend that section 5.6(b)(v)'s requirement of membership approval is the operating agreement's specified method of authorizing or ratifying the act that would otherwise violate the duty of loyalty. Thus, they conclude, in this situation, the principal is the membership, not the board.

The intervenors' contention is without merit. As discussed above, the verb "acquire" in section 5.6(b)(v) does not include the verb "reacquire" and, therefore, section 5.6(b)(v) does not apply to HES's "reacquisition" of a director's or affiliate's HES units. Accordingly, the board was not acting as an agent but rather as the principal.

**C. Conclusion.** Retterath's and the intervenors' arguments that HES's operating agreement, Iowa common law, and Iowa Code chapter 489 require membership approval of the MURA are not persuasive. We, therefore, hold that membership approval of the MURA was not required. The district court did not err in granting summary judgment in favor of HES on this issue or in rejecting Retterath's argument on this issue at trial.

**VII. Whether the District Court Erred in Denying Retterath's Motion for Evidentiary Sanctions or a Continuance.**

Less than two weeks before trial, HES produced roughly 200 pages of documents that it characterized as bank approvals or waivers from HFSB regarding HES's intended buyback of Retterath's units.[3] Retterath contends the district court abused its discretion in denying his motion to

---

[3]Some of these documents were offered as exhibits at trial. However, other than exhibit 32, Retterath provides essentially zero indication on which exhibits these documents became.

exclude those documents or, in the alternative, for a continuance to allow for further discovery. We find no abuse of discretion.

First, Retterath asserts that he clearly asked for the information in those documents—namely, proof of bank approval for financing the MURA—in the February 19, 2016, September 30, 2016, and other discovery requests he served on HES. A review of the discovery he cites to in the record reveals otherwise.

In none of the discovery in the record did Retterath specifically and clearly request documentation or proof that HES received lender approval and obtained the financing necessary to repurchase his units. In response to several of Retterath's requests for admission, HES admitted that it received approval from its primary lender and obtained the financing necessary to repurchase his units as contemplated in the MURA. But Retterath merely asked for all documents that support any *denials* made in HES's responses to his request for admissions.

Indeed, Retterath did not specifically and clearly request documentation of this nature until less than one month before trial. On December 20, 2016, he served deposition subpoenas on HES directors who were being deposed the next two days. Pursuant to the deposition subpoena, deponents were directed to have with them certain documents, including,

> 1. Bank statements for all accounts held by HES reflecting cash on hand from June 13, 2013, through January 31, 2014.
>
> 2. Any Notices to Home Federal Savings Bank between July 1, 2013, to August 5, 2013, requesting payment or transfers of funds to Steve Retterath or to accounts owned or controlled by HES.
>
> 3. Documentation relating to any credit facility upon which HES could borrow funds between July 1, 2013, and August 5, 2013.

. . . .

5. Any computations or work papers generated by HES's CFO or provided by RSM McGladrey to HES related to minimum equity and/or minimum tangible net worth requirements or any other covenants in any loan agreements with HES and any lender.

6. All documentation exchanged (including correspondence, emails, work papers, memorandums, etc.), between HES and Home Federal Savings Bank in generating the proposed loan commitment dated July 12, 2013 . . . .

Rule of Civil Procedure 1.707(3) allows the notice of deposition to a party deponent to include a request for the production of documents at the deposition. Iowa R. Civ. P. 1.707(3). In this case, the directors given the notice are party deponents. Rule 1.512 governs the procedure of such requests and the production of the requested documents. In pertinent part, it allows a party up to thirty days to respond after service of the request. *Id.* r. 1.512(2)(*b*)(1). Accordingly, when the HES directors produced the documents at issue on January 4 and 6, 2017, they were well within the thirty-day compliance period.

Retterath cannot claim prejudice from documents produced in compliance with the rules of procedure and which contain information that he did not clearly request earlier. Moreover, even though he claims he could not meaningfully share that information with his expert before trial, he does not identify any reason why. To be sure, 200 pages of documentation is not a nominal amount of information. However, Retterath's expert had fourteen to sixteen days to review the information as the expert did not testify at trial until January 20.

Further, as Retterath does not clearly identify which portions of the record encompass these documents or otherwise provide us with a copy of the documents at issue, we cannot ascertain whether the information in the documents would warrant an extension of time for expert

consideration or not. The only portion of the record Retterath's brief indicates is relevant to this issue is exhibit 32, which is a June 21, 2013 email from the HFSB officer to HES's CEO and CFO with draft documents for amending HES's MLA attached. Although technical, we find nothing in that exhibit to require more than two weeks of an expert's time to understand.

Finally, we note that if Retterath wanted the specific information contained in the documents sooner, he could have served discovery requests specifically asking for that information, as he did in the December 20 deposition subpoena. Alternatively, he could have served the deposition subpoena sooner, especially considering the deposition deadline was supposed to be November 18, 2016, which the parties agreed to postpone.

Retterath's discovery requests do not clearly indicate he is asking for documentation or information supporting HES's claim that it received lender approval and obtained the financing necessary to repurchase Retterath's units. The clear request for this information came less than one month before trial even though Retterath could have made the request sooner. The information was timely produced within thirty days of service of the request. *See id.* And Retterath had two weeks before his expert testified in which his expert could review the documentation. We do not think the court abused its discretion in denying Retterath's motion for evidentiary sanctions or for a continuance for further discovery.

**VIII. Whether the MURA Is a Valid and Binding Agreement.**

Retterath contends the MURA is not a valid and binding agreement because HES had not fully signed or approved it by the MURA's execution

deadline. He relies on section 1 of the MURA in support. Section 1 of the MURA provides,

> Repurchase. At the Closing (as hereinafter defined), the Company shall repurchase all, but not less than all, of the Units from Member, free and clear of all liens, security interests, claims and encumbrances, and Member's interest in the Company shall be terminated. Member acknowledges and agrees that Member shall not be entitled to receive any distribution of income from the Company or exercise any rights as a member of the Company following the Closing. **THIS AGREEMENT SHALL NO LONGER BE A BINDING OFFER AND SHALL BE NULL AND VOID AND OF NO FURTHER EFFECT IF IT IS NOT FULLY SIGNED BY MEMBER AND DELIVERED TO THE COMPANY PRIOR TO 2:00 P.M. LOCAL TIME ON THURSDAY, JUNE 13, 2013.**

Because of the bolded language in section 1 of the MURA, Retterath claims the MURA's execution deadline was June 13, 2013, which meant the MURA had to be fully signed by both HES and himself on that date.

We find no merit in his argument. The bolded language in section 1 expressly indicates HES's offer to repurchase Retterath's units as conveyed in the MURA would no longer be available if the MURA was not fully signed by only Retterath and delivered to HES before the deadline. Nothing in section 1 conditions the effectiveness or availability of the MURA on HES or its board executing or approving the agreement by June 13.

**IX. Whether HES Is Entitled to Specific Performance of the MURA.**

Retterath next claims that there was insufficient evidence that HES is entitled to specific performance of the MURA. Specific performance is a possible equitable remedy for a breach of contract. *See Berryhill*, 428 N.W.2d at 657. However, it is not granted as a matter of right but is in the court's discretion. *Breitbach*, 541 N.W.2d at 843; Restatement (Second) of Contracts § 357 cmt. *c*, at 167–68. The object of this remedy "is to best

effectuate the purpose for which a contract is made" and should be granted upon the terms and conditions justice requires. *Lange v. Lange*, 520 N.W.2d 113, 118 (Iowa 1994); *Berryhill*, 428 N.W.2d at 657.

With respect to contracts involving personal property, we have stated, "Specific performance of contracts in relation to personal property will not be enforced ordinarily, or in the absence of special circumstances making the payment of damages inadequate to afford proper relief." *Gingerich v. Protein Blenders, Inc.*, 250 Iowa 654, 657, 95 N.W.2d 522, 524 (1959). That rule applies to a membership interest in an LLC, which Iowa Code section 489.501 indicates is personal property. *See* Iowa Code § 489.501 ("A transferable interest is personal property."); *see also id.* § 489.102(24) (defining "transferable interest" as "the right, as originally associated with a person's capacity as a member, to receive distributions from a limited liability company in accordance with the operating agreement, whether or not the person remains a member or continues to own any part of the right"); *cf. Gingerich*, 250 Iowa at 657, 95 N.W.2d at 524 (noting corporate stock is personalty and applying the same rules).

The record indicates that the MURA was primarily intended to facilitate HES's repurchase and retirement of Retterath's units. MURA unnumbered paragraph 2 states "**WHEREAS,** the Company desires to repurchase and retire, and Member desires to have the Company repurchase and retire, the Units pursuant to the terms and conditions set forth below." The record also indicates the MURA served other purposes— namely, extinguishment of Retterath's board-appointment powers and removal of Retterath as a member and director of HES. This indication is clear when one considers section 5.3(f) of the operating agreement, stating whenever the number of units of a member with director-appointment power falls below 5000 the member loses that power, with parts of the

MURA. In section 1 of the MURA, Retterath acknowledges that he will not be entitled to any distributions or to exercise any member rights after the closing on the MURA. Section 5(e) of the MURA provides that a condition to HES's performance is that both Retterath and his board appointee, Stephen Eastman, resign from the board. Together, these provisions suggest one of HES's goals for the MURA was to remove Retterath as a director and to extinguish the exercise of his appointment powers.

Undoubtedly, requiring the parties to the MURA to specifically perform their obligations under the MURA would effectuate the MURA's purposes. But specific performance is not an appropriate remedy under certain circumstances. Retterath claims those circumstances make specific performance inappropriate in this case.

**A. Adequacy of Remedy at Law.** One circumstance precluding specific performance is "if damages would be adequate to protect the expectation interest of the injured party." Restatement (Second) of Contracts § 359(1), at 169. Thus, unless HES established that legal damages for Retterath's breach of the MURA are incomplete and inadequate, ordering specific performance would be inappropriate. *See Gingerich*, 250 Iowa at 657, 95 N.W.2d at 524; 81A C.J.S. *Specific Performance* § 62, at 216 (2015).

Courts look to several factors when determining if damages provide an adequate remedy. These include "the difficulty of proving damages with reasonable certainty," "the difficulty of procuring a suitable substitute performance by means of money awarded as damages," and "the likelihood that an award of damages could not be collected." Restatement (Second) of Contracts § 360, at 171; *see, e.g., Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 423 (Iowa 1977) (noting that specific performance is available as a remedy if the property at issue is unique or has special value and that

the defendant's financial situation is a factor to consider in determining whether damages are an adequate remedy). Retterath claims application of these factors demonstrate there is an adequate remedy at law and, therefore, specific performance is inappropriate.

1. *HES's ability to procure a suitable substitute.* Damages may not be an adequate remedy if the party seeking specific performance cannot "readily procure by the use of money a suitable substitute for the promised performance." Restatement (Second) of Contracts § 360 cmt. *c*, at 172–73. Another way of characterizing this factor is whether the property at issue is unique. *See id.* at 173 (noting "[i]f goods are unique in kind, quality or personal association," procuring a suitable substitute may be impracticable); *see, e.g., Berryhill*, 428 N.W.2d at 657 ("Specific performance is available when the contract involves property which is unique."). We have not had the occasion to consider whether a membership interest in an LLC is unique property. However, we have considered whether corporate stock qualifies as unique property.

In *Lyon*, we noted that "[a] contract for sale of stock of a closely held corporation which is not procurable in any market is a proper subject for specific performance." 288 N.W.2d at 894. There, the two plaintiffs and the one individual defendant were the only stockholders in the corporation at issue and the sale-of-stock contract was a buy-sell agreement between the two plaintiffs and the individual defendant. *Id.* at 886. We concluded specific performance was appropriate. *Id.* at 894.

In *Schmidt v. Pritchard,* we adopted the rule that a decree of specific performance compelling delivery of withheld stock is appropriate when the stock's value is not easily ascertainable, when the stock is not readily obtainable elsewhere, or when there is a particular reason requiring delivery of the stock. 135 Iowa 240, 248, 112 N.W. 801, 804 (1907). There,

we noted that the plaintiff had agreed to pay a certain amount for the stock and had tendered a check for that amount. *Id.* at 247, 112 N.W. at 804. But we also noted that the stock did not have any market value, it could not be bought in the open market, and the defendants were withholding the stock in an attempt to take and keep control of the corporation even though the plaintiff's faction was in control. *Id.* at 248, 112 N.W. at 804. We affirmed the order of specific performance of the delivery of the stock. *Id.* at 250, 112 N.W. at 805.

The Restatement is in line with our caselaw. Restatement (Second) of Contracts § 360 cmt. *c*, at 173 (providing that if shares of stock of a corporation are not obtainable elsewhere, damages may not be an adequate remedy).

HES contends that Retterath's units are unique because of the unit certificate numbers, which HES does not duplicate and retires when those units are redeemed. Nothing in our caselaw indicates that a unique identification number renders that personal property sufficiently unique for purposes of specific performance. Moreover, the personal property at issue is the membership interest in the HES units, not unit certificates that are merely a physical representation of that interest.

HES also contends Retterath's units are unique because of the board appointment powers accompanying them. We agree.

The Restatement provides a helpful illustration for a somewhat similar situation. Illustration 7 to comment *c* of section 360 provides,

> A contracts to sell to B 1,000 shares of stock in the X Corporation for $10,000. A repudiates the contract and B sues for specific performance. Other shares of X Corporation are not readily obtainable and *B will suffer an uncertain loss as a result of diminished voting power.* Specific performance may properly be granted. *If other shares were readily obtainable, even though at a considerably higher price, specific performance would be refused.*

Restatement (Second) of Contracts § 360 cmt. *c*, illus. 7, at 173 (emphasis added).  Like the illustration, Retterath contracted to sell HES his 25,860 units, he did not perform under the contract, and HES sued for specific performance.  In addition, similar to the illustration, HES claims it will suffer an uncertain loss because of the appointment powers attached to Retterath's units, powers which can affect the board's personnel and voting.

There is some merit to that comparison because HES's board has diminished director-appointment power if Retterath keeps his units instead of being ordered to specifically perform.  Under section 5.3(f) of the operating agreement, whenever the number of units of a member with director-appointment power falls below 5000, the member loses that director-appointment power, that member's board appointee's term expires, and the board gains the right to appoint the successor to the board.  The record reveals that Retterath's two board appointees continued to serve on the board after the scheduled closing date of the MURA, although there is conflicting evidence of whether those appointees served at Retterath's or the board's pleasure.  Nevertheless, under HES's operating agreement, Retterath would retain the power to remove either of those two appointees and appoint someone else, including himself, if he keeps his units instead of being ordered to specifically perform.  Such a situation is similar to *Schmidt*, where we ordered specific performance because, in part, the breaching party was withholding the stock at issue in an attempt to take and keep control of the corporation even though the nonbreaching party's faction was in control.  *See* 135 Iowa at 248–49, 112 N.W. at 804–05.

Additionally, as in the Restatement illustration, *Schmidt*, and *Lyon*, Retterath's specific units are not available on an open market.  *See Lyon*,

288 N.W.2d at 894; *Schmidt,* 135 Iowa at 247, 112 N.W.2d at 804–05; Restatement (Second) of Contracts § 360 cmt. *c,* illus. 7, at 173. There is a website where interested buyers and sellers can connect to pursue direct sales of HES units, but nothing in the record indicates Retterath ever used or intended to use that website to sell his units to HES or any other third party. HES was not in the market to buy or repurchase HES units, generally, but sought to buy back only Retterath's specific units because of their ownership and accompanying board-appointment powers.

Because of the uniqueness of Retterath's specific units, HES would be unable to "readily procure by the use of money a suitable substitute for the promised performance." Restatement (Second) of Contracts § 360 cmt. *c,* at 172–73. This factor augurs in favor of HES's contention that damages do not provide an adequate remedy for Retterath's breach.

2. *Difficulty of proving damages.* This factor considers whether "[t]he damage remedy may be inadequate to protect the injured party's expectation interest because the loss caused by the breach is too difficult to estimate with reasonable certainty." *Id.* § 360 cmt. *b,* at 171. HES claims it expected the MURA to result in the redemption of Retterath's units, extinguishment of Retterath's appointment powers, and Retterath's removal from the board and as a member of HES. The loss caused by the inability to redeem Retterath's units, to extinguish Retterath's appointment powers, and to remove Retterath as a member of HES cannot be estimated with reasonable certainty. Thus, this factor also supports HES's contention that damages do not provide an adequate remedy.

3. *Likelihood of collecting an award of damages.* HES does not make any argument that it is unlikely it could collect an award of damages from Retterath through judgment and execution. And there is nothing in the record suggesting HES would not be able to collect a damages award from

Retterath. *See id.* § 360 cmt. *d*, at 174 (providing examples of when the difficulty of collecting damages renders a damages remedy inadequate, including being judgment proof, concealment of assets, or public policy against preferential transfers). Accordingly, this factor augurs in favor of the adequacy of a damages remedy.

Upon consideration of these factors, we conclude that HES would not have an adequate remedy at law for Retterath's breach of the MURA. The inadequacy of the remedy at law supports specific performance as a remedy.

**B. HES's Good Faith and Conduct.** Another circumstance precluding specific performance is when the party seeking specific performance has not acted in good faith or performed its obligations. *See, e.g., Youngblut v. Wilson*, 294 N.W.2d 813, 817 (Iowa 1980) (stating the plaintiff's inequitable conduct will justify denial of specific performance); *Tschirgi v. Merchants Nat'l Bank of Cedar Rapids*, 253 Iowa 682, 686, 689–90, 113 N.W.2d 226, 228, 230 (1962) (holding that a party in default of the terms of the contract cannot obtain specific performance unless the default is cured before trial and that specific performance will not be ordered if doing so would fulfill the requesting party's nefarious purpose); *Peterson v. Rankin*, 161 Iowa 431, 436, 143 N.W. 418, 420 (1913) ("Plaintiff must have performed his part of the contract, or tendered performance in a legal manner, before he would be entitled to insist upon a performance by the other party to it.").

Retterath argues this circumstance precludes ordering specific performance here because HES has not shown that it was ready, willing, and able to and did perform its obligations under the MURA. HES counters that Retterath's repudiation of the MURA excused HES from its performance obligations; even if Retterath had not repudiated the MURA,

he cannot rely on HES's purported failure to satisfy the conditions to its obligations as an excuse for his refusal to perform; HES either met or waived the conditions to its performance; and it tendered payment multiple times. Upon our review, we conclude that HES was excused from performance because Retterath repudiated the MURA and that, regardless, the record reveals HES was ready, willing, and able to perform its obligations and it attempted to do so. Accordingly, this circumstance would not preclude specific performance in this case.

1. *Whether HES was excused from performance because Retterath repudiated the MURA.* "Where one party to a contract repudiates the contract before the time for performance has arrived, the other party is relieved from its performance." *Conrad Bros. v. John Deere Ins.*, 640 N.W.2d 231, 241 (Iowa 2001). The repudiation of a contract is treated as having the same effect as a breach by nonperformance. *Id.*

Typically, "repudiation consists of a statement that the repudiating party cannot or will not perform." *Id.* (quoting II E. Allan Farnsworth, *Farnsworth on Contracts* § 8.21, at 535 (2d ed. 1998)); *see* Restatement (Second) of Contracts § 250, at 272. The language of the statement "must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." Restatement (Second) of Contracts § 250 cmt. *b*, at 273. However, "[l]anguage that is accompanied by a breach by non-performance may amount to a repudiation even though, standing alone, it would not be sufficiently positive." *Id.*

Beginning on June 20 and continuing through at least July 31, 2013, Retterath communicated to HES, usually through his attorney, his belief that there was no agreement because he had revoked his June 13 offer before HES could lawfully accept it and that any correspondence regarding the purported agreement was a form of terms and conditions

negotiation, not an attempt to comply with the terms and conditions of a binding agreement. Although Retterath did not expressly state he repudiated the agreement—likely because that would require him to concede there was an agreement—his repeated expressions, including up to the day before the MURA was scheduled to close, can be reasonably interpreted to mean that he did not intend to perform. And even if the language in his communications, standing alone, was not sufficiently positive, it amounted to a repudiation when Retterath breached the MURA by nonperformance. *Cf. Pavone v. Kirke*, 807 N.W.2d 828, 830–31, 833–34 (Iowa 2011) (finding a letter stating the agreement terminated pursuant to the agreement's terms was a repudiation of the agreement); *Conrad Bros.*, 640 N.W.2d at 242 (finding denial of coverage on an insurance claim manifested a clear intent not to perform even though the denial was based on a mistaken interpretation of the insurance contract).

2. *Whether HES repudiated the MURA before Retterath did.* Retterath's nonperformance may be excused if HES repudiated the MURA before he did. *See* Restatement (Second) of Contracts § 253(2) & cmt. *b,* at 286–87. In response to HES's argument, Retterath contends HES anticipatorily repudiated the MURA by stating its intention to refuse to comply with its operating agreement—namely, refusing to obtain member approval for the MURA. Retterath notes that one of the conditions of HES's obligations under the MURA was board approval of the MURA in accordance with its operating agreement.

As determined above, membership approval of the MURA is not required by HES's operating agreement. Accordingly, HES did not indicate an intention not to perform its obligations under the MURA by refusing to obtain membership approval of the MURA. HES did not repudiate the MURA.

3. *Whether HES was ready, willing, able to, and did perform.* Retterath argues that HES was not ready, willing, and able to and did not perform because it did not and could not have had the funds to close on the MURA, it did not satisfy the conditions precedent, and never tendered performance. We find that substantial evidence indicates otherwise and that HES, therefore, was ready, willing, able to, and did perform.

First, HES had the funds available and ready to be able to close on August 1, 2013. HES was allowed to supplement the record, posttrial, with documents that clearly show that it had more than $15 million available in its checking account.

Retterath challenges the admission of this evidence. But even if the evidence should not have been admitted, the other evidence in the record reveals HES had obtained the required financing and bank approval—one of the conditions Retterath argues HES did not meet.[4] The designated trial testimony from the HFSB officer indicates that as of July 1, 2013, the bank had prepared all of the loan agreements its attorney believed necessary for HES to get approval of and proceed with the buyback. The bank officer explained that HES's plan was to use its revolving line of credit to pay Retterath and that HES would take out an additional term loan to pay off the revolving line of credit. He also explained that the appraisal being done in mid-August that was referenced in the financing communications was for the term loan that HES would use to pay off its revolving line of credit. He further testified that HES had received approval from HFSB, HES's primary lender, and had secured financing for the repurchase of Retterath's units.

---

[4]Because other evidence in the record provides substantial evidence that HES had the funds available and obtained lender approval to repurchase Retterath's units, we do not address Retterath's evidentiary arguments.

In a July 12, 2013 communication, HFSB offered to lend HES up to $35,000,000—$15 million in a new term loan and $20 million on HES's existing revolving line of credit—which HES accepted. By its own terms, HFSB's commitment to finance HES's credit requests would not expire unless the credit documents were not entered into by September 15, 2013. Accordingly, the credit documents did not need to be entered into before the MURA's August 1 closing date in order for HES to have obtained the financing necessary for the repurchase agreement.

Second, HES could have had the funds under its MLA with HFSB. HES acknowledges that its MLA with HFSB did not allow it to purchase or otherwise acquire any of its units without prior written consent from HFSB. HES also acknowledges that its MLA was not actually amended to allow it to repurchase Retterath's units. Retterath claims that means HES could not close on the MURA without violating its operating agreement, which states distributions to members are "[s]ubject to the terms and conditions of any applicable loan covenants and restrictions."

This contention is without merit because, as discussed above, the distributions contemplated in section 4.1 of the operating agreement are made from HES's "net cash flow," which is defined in section 1.10(cc) of the operating agreement, and the liquidating distribution (as defined under the tax code) HES would make to Retterath for his units is not such a distribution. Moreover, the record demonstrates that the reason the MLA amending documents were not signed was the parties did not close on the MURA and, had they closed, HFSB and HES would have signed and closed on the amending documents.

Third, HES was not required to, waived, or did meet the conditions precedent in the MURA. Retterath asserts HES was not ready, willing, and able to perform because it did not comply with the conditions precedent in

section 5 of the MURA by the closing deadline. Specifically, he contends that (1) HES did not obtain required financing and bank approval, (2) the parties did not enter into a mutual release, and (3) Eastman did not resign from the board.

Under section 5(d) of the MURA, a condition to HES's obligations is that it "receives approval from its primary lender to repurchase the Units" and "secures the financing necessary to repurchase the Units." As already discussed, HES did obtain the required financing and lender approval and thereby satisfied this condition.

However, HES did not satisfy the conditions under section 5(e) and (f) of the MURA. Under section 5(e), a condition to HES's obligations is that Retterath and Eastman each submit a written resignation from HES's board. While Retterath submitted his written resignation, Eastman did not and continued to serve on the board past the August 1 closing date. Under section 5(f), a condition to HES's obligations is that Retterath and HES "enter into a mutual release agreement releasing any and all claims between the parties." There is no dispute that the parties did not enter into such a mutual release.

Retterath contends that HES must have satisfied these conditions to have been ready, willing, and able to close. He is incorrect.

By the terms of the MURA, the nonsatisfaction of section 5's conditions did not prevent HES from closing under the MURA. At the end of section 5 is a note, stating HES *may* terminate the MURA in the event any of the conditions in this section have not been waived by HES or satisfied by the closing. The use of the permissive *may* indicates HES could elect to close under the MURA even if the conditions in section 5(e) and (f) were not satisfied. That is what HES elected to do.

Moreover, HES could waive compliance with the condition in section 5(f).

> It is well established that a party may waive a condition precedent to his own performance of a contractual duty, when such condition precedent exists for his sole benefit and protection, and compel performance by the other party who has no interest in the performance or nonperformance of the condition.

*Rodgers v. Baughman,* 342 N.W.2d 801, 806 (Iowa 1983). The record does not disclose any basis for concluding that Retterath benefitted from Eastman resigning from the board. Tellingly, Retterath does not even make this argument in his brief.

Further, the record reveals HES substantially complied with the condition in section 5(e) but was stymied by Retterath's lack of response. On July 9, 2013, HES's attorney emailed Retterath's attorney a proposed mutual release and asked if he had any suggested changes. Neither Retterath nor his attorney responded. On July 16, 18, 22, 24, and 26, HES's attorney sent Retterath's attorney a series of emails and letters stating, *inter alia,* that the mutual release agreement needed to be completed and requesting proposed revisions. Again, neither Retterath nor his attorney responded regarding the mutual release. Even though this condition was not met, it would be inequitable for Retterath to rely on that to claim HES was not ready, willing, and able to close when his nonaction is the reason for that unsatisfied condition. *See Conrad Bros.,* 640 N.W.2d at 240 ("It is widely recognized that 'a party may not rely on a condition precedent when by its own conduct it has made compliance with that condition impossible.'" (quoting *State Farm Fire & Cas. Ins. v. Miceli,* 518 N.E.2d 357, 362 (Ill. App. Ct. 1987)); 17B C.J.S. *Contracts* § 703, at 149 (2011) ("A party to a contract who prevents performance thereof by

the other party, or renders it impossible, may not avail himself or herself of the wrong, and the other party is excused from performing.").

Retterath claims substantial performance is not enough to excuse the nonoccurrence of an express condition precedent. But that is a misstatement of our caselaw. Rather, our caselaw holds that substantial performance will not excuse the nonoccurrence of an express condition precedent necessary to the formation of a contract. *SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 585–86 (Iowa 2002) (rejecting the argument that substantial performance of the notice-of-intent-to-exercise-the-renewal-option condition should be sufficient to constitute acceptance of the option offer because the notice of intent to exercise the renewal option was a condition precedent to the formation of contractual obligations).

Conversely, "[s]ubstantial compliance with contract *terms* generally is sufficient to require that the other party perform . . . ." 17B C.J.S. *Contracts* § 800, at 247 (emphasis added). This is because substantial performance "excuses contractual deviations or deficiencies which do not severely impair the purpose underlying a contractual provision." *SDG Macerich Props.*, 648 N.W.2d at 586. HES's substantial compliance with the mutual-release-agreement condition in section 5(f) of the MURA does not severely impair the purpose underlying that provision.

Finally, Retterath contends HES did not actually perform its obligations under the MURA because it never tendered performance. Once again, Retterath's own actions—or lack thereof—prevented HES from tendering payment. On July 16, 18, 22, 24, and 26, HES's attorney sent Retterath's attorney a series of emails and letters requesting, *inter alia*, Retterath's wiring instructions for the closing payment. Neither Retterath nor his attorney provided that information. Retterath's failure to provide

that information to HES is in contravention of section 2 of the MURA, which provides that "[t]he payments shall be made by check or wire transfer *at the direction of* [*Retterath*]." (Emphasis added.) Retterath cannot equitably claim that HES's failure to actually pay him on the closing date meant HES was not ready, willing, and able or did not perform.

**C. Conclusion.** In sum, we hold there is sufficient evidence to conclude that HES is entitled to specific performance. We find HES does not have an adequate remedy at law. We also find no merit in Retterath's argument that HES is not entitled to specific performance because it did not act in good faith or otherwise comply with its obligations under the MURA.

**X. Whether the District Court Erred in Rejecting Retterath's Affirmative Defenses to the MURA.**

Retterath claims the district court erred in denying his affirmative defenses to the MURA of equitable estoppel, unilateral and mutual mistake, unclean hands, and procedural and substantive unconscionability. We disagree.

**A. Equitable Estoppel.** Retterath first claims the MURA should not be enforced because of equitable estoppel. The traditional elements of equitable estoppel are

> (1) a false representation or concealment of material facts; (2) a lack of knowledge of the true facts on the part of the actor; (3) the intention that it be acted upon; and (4) reliance thereon by the party to whom made, to his prejudice and injury.

*Johnson v. Johnson*, 301 N.W.2d 750, 754 (Iowa 1981).

Specifically, Retterath argues that HES always intended to allocate taxable income to him from the date of the scheduled closing through the scheduled second installment on July 1, 2014, without providing him any

distributions to cover that tax liability. He contends that allocation of income would be improper under the tax code because there is no corresponding economic event and that HES never informed him of its intended allocation plan. Further, he asserts that he could not have learned of this plan because of its inappropriateness under the tax code and that he understood he would not be allocated taxable income after closing.

HES explains that it did not have any intention to implement that allocation plan until 2014, when it and its accountants began preparing the tax returns and member K-1 documents for fiscal year 2013. We have not found anything in the record indicating that HES intended to implement that tax allocation plan at the time of or before the MURA's scheduled closing deadline.

The record citations Retterath provides to the contrary are not persuasive. One is to a brief HES filed in a parallel federal court case, but that brief was filed in November 2014. Thus, the positions in the brief do not discredit HES's explanation that it did not develop that allocation plan until 2014. Retterath's other two record citations merely demonstrate that one of the board members and Retterath himself believed he would not be allocated taxable income after closing on the MURA.

Further, to the extent that HES's allocation plan was unlawful under the tax code, it does not render the MURA unenforceable. Nothing in the MURA established what the allocation plan would be.

Lastly, as HES asserts, Retterath had the opportunity to seek tax advice and determine the tax implications of the MURA before he signed it. Section 3 of the MURA states,

> Member warrants and represents that: . . . (v) In making the decision regarding the repurchase of the Units, Member is relying solely upon the Company Information and

> Member's legal and financial advisors and independent investigations and not upon the Company or any of its members, managers, officers, directors, employees or representatives with respect to value, *tax*, business, economic or other considerations involved in this transaction . . . .

(Emphasis added.) Retterath did not discuss the MURA's tax consequences with an expert prior to signing.

The district court properly rejected Retterath's estoppel defense.

**B. Unilateral and Mutual Mistake.** Next, Retterath argues the MURA should not be enforced because of unilateral and mutual mistake. Specifically, the mistake at issue is how HES would allocate taxable income to him after the MURA's closing.

With respect to a unilateral mistake, the Restatement (Second) of Contracts provides,

> Where a *mistake of one party* at the time a contract was made *as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him,* the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
>
> (b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts § 153, at 394 (emphasis added). We have said that a party's unilateral mistake does not relieve that party of its obligations under the contract "absent fraud, misrepresentation, or other misconduct." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 150 (Iowa 2001).

Here, Retterath asserts that HES engaged in misrepresentation or other misconduct by concealing its intent to improperly allocate taxable income to him after closing. As discussed above, the record does not support Retterath's claim that HES intended, at the time the parties

entered into the MURA, to allocate taxable income to him at all after closing. Thus, his unilateral mistake defense fails.

With respect to mutual mistake, the Restatement provides,

(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

(2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.

Restatement (Second) of Contracts § 152, at 385; *accord State ex rel. Palmer*, 637 N.W.2d at 150 ("Generally, mutual mistake will render a contract voidable by the party who is adversely affected by the mistake when the parties are mistaken on a basic assumption on which the contract was made, unless the adversely affected party bears the risk of mistake.").

Retterath claims the mistake here involved the basic assumption on which the contract was made—i.e., that he would receive $30 million for his units. Comment *b* to section 152 of the Restatement indicates that an assumption related to a party's financial situation or market conditions are generally not "basic assumptions" that would justify avoidance of the contract. Restatement (Second) of Contracts § 152 cmt. *b*, at 386; *cf. id.* illus. 1–6, at 387. On a spectrum, the resulting allocation of taxable income from the sale of Retterath's units is more like an assumption related to something collateral to the contract than one of the parties' foundational reasons for entering into the MURA.

Retterath's unilateral and mutual mistake defenses are without merit and were properly rejected.

**C. Unclean Hands.** The equitable defense of unclean hands means

that whenever a party who seeks to set the judicial machinery in motion and obtain some equitable remedy has violated conscience or good faith, or another equitable principle in prior conduct with reference to the subject in issue, the doors of equity will be shut, notwithstanding the defendant's conduct has been such that in the absence of circumstances supporting the application of the maxim, equity might have awarded relief.

*Opperman v. M. & I. Dehy, Inc.*, 644 N.W.2d 1, 6 (Iowa 2002) (quoting 27A Am. Jur. 2d *Equity* § 126, at 605 (1996)).

Retterath claims HES engaged in the following inequitable conduct: (1) concealing its intent to improperly allocate taxable income to him after closing on the MURA, (2) determining that it "equitably acquired" Retterath's units while still treating him as the "beneficial owner" for tax allocation purposes but not for distribution, and (3) negotiating and communicating directly with Retterath after his counsel had instructed HES to communicate through attorneys.

Procedurally, Retterath has waived these contentions on appeal under Iowa Rule of Appellate Procedure 6.903(2)(*g*). He cites no caselaw or authority suggesting HES's alleged conduct violated the conscience or was not done in good faith. Nor does he provide any argument or reasoning as to why this conduct renders HES's hands unclean.

Even if these arguments are not waived, they are not meritorious. First, as discussed above, nothing in the record indicates that HES concealed its intent (or even had the intent) to allocate taxable income to Retterath after closing on the MURA.

Second, HES's "equitable acquisition" of Retterath's units after the scheduled closing and its resulting conduct coincide with its belief that the MURA is a binding agreement and with the effect of the MURA had it closed as scheduled. Section 1 of the MURA indicates that Retterath would no longer be entitled to any distributions from HES after the closing.

Additionally, there is nothing in the MURA regarding ownership for tax allocation purposes. Further, Retterath does not argue and fails to show that HES's allegedly improper tax allocations were done in bad faith.

Third, even though HES was instructed by Retterath's attorney to contact Retterath through his attorney only, there is nothing in the record to indicate that chairman Boyle's direct communications with Retterath regarding the MURA were done in bad faith or otherwise violate the conscience. Retterath's attorney's instruction was emailed to HES's attorney after HES's attorney contacted Retterath about being interviewed as part of the board's investigation into Retterath's alleged bribery of another board member. Nothing in Retterath's attorney's email instructs members of HES's board to cease direct communication with Retterath either on the subject of the bribery investigation or other subjects. Moreover, before June 2013, the communication between HES and Retterath regarding repurchasing Retterath's units had been directly between Retterath and the board. Finally, Retterath acquiesced to direct contact from HES's board chairman regarding the June buyback negotiations by directly responding to the chairman's communications instead of passing them along to his attorney. Considering his own attorney had upbraided HES's attorney just two weeks earlier for contacting Retterath directly, presumably Retterath knew not to handle communications from HES without consulting or involving his attorney. Retterath's own acquiescence in the direct communication with HES's board chairman and knowledge of his attorney's communication instruction undermines his claim that the board chairman's direct communications were done in bad faith or violate the conscience.

Retterath's unclean hands defense lacks merit and was properly rejected.

**D. Substantive and Procedural Unconscionability.** Retterath's final affirmative defense is that the MURA is procedurally and substantively unconscionable.

"A contract is unconscionable where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." *Albaugh v. Reserve*, 930 N.W.2d 676, 687 (Iowa 2019) (quoting *C & J Vantage Leasing Co.*, 795 N.W.2d at 80). This defense includes both procedural and substantive elements. *In re Marriage of Shanks*, 758 N.W.2d 506, 515 (Iowa 2008). For an agreement to be unconscionable, it must be so at the time it was made. *Bartlett Grain Co. v. Sheeder*, 829 N.W.2d 18, 27 (Iowa 2013); Restatement (Second) of Contracts § 208, at 107. When analyzing unconscionability claims, we consider the factors of "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *C & J Vantage Leasing Co.*, 795 N.W.2d at 80 (quoting *C & J Fertilizer, Inc. v. Allied Mut. Ins.*, 227 N.W.2d 169, 181 (Iowa 1975) (en banc)).

However, this defense does not exist to rescue a party from an imprudent bargain or buyer's remorse:

> People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

*In re Marriage of Shanks*, 758 N.W.2d at 515 (quoting *Smith v. Harrison*, 325 N.W.2d 92, 94 (Iowa 1982)).

1. *Procedural unconscionability.* Retterath argues that the MURA is procedurally unconscionable because HES negotiated directly with Retterath; HES demanded Retterath sign the MURA by June 13, 2013, but did not authorize chairman Boyle's signature until June 19; HES presented the MURA as an extortionate way of ending its investigation into Retterath's alleged bribery; and HES ignored questions from Retterath's attorney about the MURA's enforceability and assurance that HES could perform in compliance with its operating agreement.

"Procedural unconscionability involves an advantaged party's exploitation of a disadvantaged party's lack of understanding, unequal bargaining power between the parties, as well as the use of fine print and convoluted language." *C & J Vantage Leasing Co.*, 795 N.W.2d at 81. Other factors relevant to a procedural unconscionability analysis include

> the disadvantaged party's opportunity to seek independent counsel, the relative sophistication of the parties in legal and financial matters, . . . and the use of fraudulent or deceptive practices to procure the disadvantaged party's assent to the agreement.

*In re Marriage of Shanks*, 758 N.W.2d at 517–18 (citations omitted).

Application of these factors to the case at bar reveals the MURA is not procedurally unconscionable. HES and Retterath were of generally equal bargaining power. Both made offers and counteroffers regarding the buyback of Retterath's units. Both made adjustments to the terms of the offers. Indeed, Retterath initiated the June negotiations by offering to sell for $1100 per unit (or $28,446,000 total) but was able to obtain an agreement to sell for $30,000,000 total. As illuminated by the Restatement, it is "*gross* inequality of bargaining power, together with terms unreasonably favorable to the stronger party," that evidences

unconscionability. Restatement (Second) of Contracts § 208 cmt. *d*, at 109 (emphasis added). This factor is not present here.

Additionally, both had ready access to and often consulted with their attorneys. Moreover, Retterath had the opportunity to consult his attorney about the MURA's terms before signing and, by signing the MURA, acknowledged that opportunity.

Retterath was a sophisticated party. He had decades of experience in negotiating and executing multimillion dollar contracts on tight deadlines. In December 2012, he had negotiated and executed a buyback agreement that was substantially similar to the MURA. Notably, the December 2012 buyback agreement included a provision regarding the allocation of taxable income. Retterath's experience in legal and financial matters, regular contact with counsel, and execution of the December 2012 buyback agreement evidence his understanding and sophistication and a lack of exploitation on HES's part.

Moreover, the MURA was a relatively straight-forward agreement. It was only four pages and substantially similar to at least one other recent buyback agreement Retterath executed. It included a minimal amount of fine print, and the information, terms, and conditions of the agreement were presented in a readable format.

Next, we cannot say HES used fraudulent or deceptive practices to procure Retterath's assent. As discussed above, the direct negotiation and communication between HES's chairman and Retterath was not done in bad faith or to otherwise prevent Retterath from consulting with his attorney.

The imposition of a deadline on the acceptance of an offer is completely ordinary in the world of contract offers and acceptance. Nothing in the record indicates either that Retterath assumed chairman

Boyle's signature on the MURA meant the board had already approved the MURA or that Retterath would not have executed the MURA had he known the board had not yet approved the MURA.

Likewise, nothing in the record indicates that HES included the mutual release provision in the MURA specifically as an extortionate way of ending its bribery investigation in exchange for Retterath's assent to the MURA. In support of his argument, Retterath cites to a set of emails from chairman Boyle to another board member. But these emails are from the middle of May 2013, before Retterath had reinitiated buyback negotiations and almost a month before Boyle emailed Retterath the first June buyback offer on June 11.

Further, the June 11 buyback offer from HES did not include a mutual release provision. The mutual release provision was not added until after Retterath rejected the June 11 offer on the grounds that he could not give HES an "unsecured promissory note" (i.e., an installment plan) if HES also wanted him to hold it harmless. In his rejection, Retterath offered to hold HES harmless if HES paid him in one lump sum. The record indicates the mutual release provision was not HES's attempt to extort Retterath's assent to the MURA in exchange for dropping the bribery investigation but rather was a result of Retterath's own counteroffer.

Finally, Retterath's argument on the ground that HES ignored his attorney's questions regarding the MURA's enforceability and assurance that HES could perform lack merit. Any lack of response to these questions does not make the MURA unconscionable because the questions were not posed to HES until after HES and Retterath had entered into the MURA. *See, e.g., Bartlett Grain Co.,* 829 N.W.2d at 27 (noting an agreement must be unconscionable at the time it was entered into). Nor

is the lack of response evidence that HES deceived Retterath into signing the MURA because Retterath had the opportunity to consult with his attorney before signing but failed to do so.

The district court properly rejected Retterath's procedural unconscionability defense.

2. *Substantive unconscionability.* Retterath argues the MURA is substantively unconscionable because HES deceitfully intended to improperly allocate him taxable income; section 5 of the MURA would allow HES to waive its release of Retterath from liability while it was investigating him for bribery; section 5 would allow HES to waive the condition of financing, which would leave Retterath as an unsecured creditor of HES with respect to the second $15 million payment; and section 5 would allow HES to waive the condition of bank approval, which would expose Retterath to potential disgorgement and other actions by HES members because HES's payment to Retterath would be in violation of its loan covenants and operating agreement.

"A substantive unconscionability analysis focuses on the 'harsh, oppressive, and one-sided terms' of a contract." *In re Marriage of Shanks*, 758 N.W.2d at 515 (quoting *Rite Color Chem. Co v. Velvet Textile Co.*, 411 S.E.2d 645, 648 (N.C. Ct. App. 1992)). We do not find that Retterath's contentions prove the MURA was substantively unconscionable.

As discussed above, the record does not support Retterath's claim that HES always intended to improperly allocate him taxable income and entered into the MURA with that intention. Rather, the record shows that HES did not make any decisions regarding tax allocations until several months after the MURA was scheduled to close.

Also as discussed above, the mutual release provision in the MURA was not related to HES's bribery investigation. Moreover, section 5 of the

MURA conditions HES's performance on HES and Retterath entering into a *mutual* release. Provisions that are mutual in scope augur against substantive unconscionability. *See id.* at 516 (holding a premarital agreement was not substantively unconscionable because, in part, the agreement's provisions were mutual in scope). And, to reiterate, Retterath had the opportunity to consult counsel regarding the terms of the MURA, and he had the bargaining power to modify the terms of the MURA such that HES would not be able to waive the mutual release condition. That was not a harsh, oppressive, or one-sided term.

Likewise, HES's ability to waive the condition of financing under section 5 is not harsh, oppressive, or one-sided because it would leave Retterath as an unsecured creditor. Retterath had the opportunity and ability to reject or modify that term of the agreement as demonstrated by his previous rejection and counteroffer to the first June draft MURA. He acquiesced to that term without exercising that opportunity or ability. Such a term that is readily open to negotiation cannot be said to be harsh, oppressive, or one-sided. For similar reasons, HES's ability to waive the condition of bank approval under section 5 does not render the MURA substantively unconscionable.

Finally, Retterath was getting $30 million for his units. HES was required to pay him $15 million immediately. He only paid $26 million for his shares. Thus, he made a profit of $4 million on his investment.

The district court properly rejected Retterath's substantive unconscionability defense.

**XI. Whether the District Court Erred in Awarding HES Attorney Fees and Denying Retterath Attorney Fees.**

Retterath contends the district court abused its discretion in awarding HES attorney fees based on the MURA. He also contends the

court abused its discretion in denying his motion for sanctions regarding HES's attorney fees motion.  We address each argument in turn.

**A. Attorney Fees Under the MURA.**  Ordinarily, an award of attorney fees is not allowed unless authorized by statute or contract. *Colwell v. Iowa Dep't of Human Servs.*, 923 N.W.2d 225, 237 (Iowa 2019). Under Iowa Code section 625.22, "[w]hen judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court."  Iowa Code § 625.22.  The agreement to pay attorney fees and litigation expenses must be an express provision in the contract.  *NevadaCare*, 783 N.W.2d at 470.

Retterath and HES dispute whether section 4 of the MURA is "an agreement to pay an attorney fee."  Iowa Code § 625.22.  Section 4 is an indemnification provision and provides,

> Member agrees to indemnify, defend and hold harmless the Company and its members, managers, officers, directors, employees and representatives from and against any and all claims, suits, losses, liabilities, costs, damages, expenses, including reasonable attorneys' fees and costs, arising, directly or indirectly, out of or resulting from: (i) any breach or material inaccuracy of any representation or warranty by Member contained in this Agreement; or (ii) failure by Member to perform his obligation under this Agreement.

HES claims section 4 allows it to recover attorney fees resulting from Retterath's breach of the MURA—i.e., his failure to perform his obligation under the MURA.  Retterath disagrees.

We have held that indemnification clauses that use the terms "indemnify" and "hold harmless" evidence the parties' intent to protect a party from claims brought by third parties.  *Estate of Pearson ex rel. Latta v. Interstate Power & Light Co.*, 700 N.W.2d 333, 344–45 (Iowa 2005). Accordingly, an indemnity clause in a contract cannot be used to shift

attorney fees between the parties "unless the language of the clause shows an intent to clearly and unambiguously shift the fees." *NevadaCare*, 783 N.W.2d at 471.

In *NevadaCare*, we addressed a contract with an indemnity provision similar to section 4 of the MURA. *See id.* at 470. In that case, NevadaCare agreed to indemnify and hold harmless the other party to the contract (the Iowa Department of Human Services) from any costs and expenses, including attorney fees, related to, among other things, "[a]ny breach of this Contract." *Id.* (emphasis omitted). We found that language did not clearly and unambiguously show the parties' intent to shift the attorney fees the department incurred in its breach of contract action against NevadaCare. *Id.* at 471.

In reaching our holding, we looked at the contract as a whole, especially the practical realities of the contract. *See id.* at 471–72. The contract between NevadaCare and the department required NevadaCare to contract with physicians to provide Medicaid services on behalf of the department. *Id.* Thus, there was a clear possibility of a third-party—a contracted physician—suing the department if NevadaCare breached its contract with the department and thereby caused the department to breach a duty to the physician. *See id.* at 471–72. We indicated that the purpose of the indemnity provision—including its shifting of attorney fees—was to protect the department in such a breach of contract situation. *See id.*

We also identified an example of language in an indemnity provision that clearly and unambiguously showed the parties' intent to shift attorney fees incurred in breach of contract actions. *Id.* at 472. Subsequent contracts between NevadaCare and the department included substantially similar indemnification provisions as the prior contract. *Id.* But the

subsequent contracts also included an explicit fee-shifting provision, which provided,

> In the event the [department] should prevail in any legal action arising out of the performance or non-performance of the contract, [NevadaCare] shall pay, in addition to any damages, all expenses of such action including reasonable attorney's fees and costs. The term "legal action" shall be deemed to include any administrative proceedings, as well as all actions at law or equity.

*Id.* at 472.

We find the indemnification provision in section 4 of the MURA does not clearly and unambiguously express Retterath and HES's intent to shift the attorney fees HES incurred in this breach of contract action. HES seeks to distinguish this case from *NevadaCare* on the ground that there are not plausible scenarios where a third-party would bring an action against HES if Retterath breached the MURA. But that contention is inapt.

For example, the MURA's indemnity clause applies to claims resulting from "any breach or material inaccuracy of any representation or warranty by [Retterath] contained in this Agreement." One such warranty and representation Retterath makes in section 3(vi) of the MURA is that "no authorization, consent or approval of any other party is necessary to the validity of the transaction contemplated by the Agreement or to permit the consummation of the transaction contemplated herein." If Retterath had used the units as collateral in a transaction with a third party, agreed to not sell the units without the third party's consent, allowed HES to repurchase the units without the third party's consent, and then defaulted on the transaction with the third party such that the third party sought to repossess the units, the third party could bring a claim against HES to recover the units. In that scenario, Retterath's breach of the MURA could

result in a third-party action against HES, which would be covered by the MURA's indemnification provision.

Moreover, similar to the contract in *NevadaCare*, the MURA contemplates HES contracting with a third party for the financing necessary to repurchase the units. If HES contracted for such financing but then breached that contract as a result of Retterath's failure to perform his obligations under the MURA, the third-party financer could sue HES. In that scenario, Retterath's breach of the MURA could result in a third-party action against HES, which would also be covered by the MURA's indemnification provision.

Finally, we note that the MURA does not contain any other provision or language like the explicit fee-shifting provision found in the subsequent contracts between NevadaCare and the department of human services. *See NevadaCare*, 783 N.W.2d at 472. There is, of course, no mandate that a fee-shifting provision in a contract must be substantially similar to the one quoted in *NevadaCare*. But the lack of anything remotely similar in the MURA—a contract that was drafted after our *NevadaCare* opinion— and HES's counsel's involvement in the *NevadaCare* case undercuts HES's argument that section 4 of the MURA should be construed to include such language.

Neither section 4 nor any other language in the MURA clearly and unambiguously demonstrates Retterath and HES's intent to shift attorney fees in non-third-party cases resulting from Retterath's breach of the MURA. We reverse the district court's award of attorney fees to HES.

**B. Sanctions.** Retterath also challenges the district court's denial of his motion for sanctions under Iowa Rule of Civil Procedure 1.413. Under rule 1.413, motions must be signed or will be stricken from the

record. Iowa R. Civ. P. 1.413(1). Counsel's signature on any motion certifies, *inter alia*,

> that to the best of counsel's knowledge, information, and belief, formed after reasonable inquiry, [the motion] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.

*Id.* If a motion is signed in violation of rule 1.413, the court shall impose sanctions, "which may include an order to pay the other party or parties the amount of the reasonable expenses incurred because of the filing of the motion, . . . including a reasonable attorney fee." *Id.*

Compliance with the rule is determined at the time the motion is filed. *Barnhill*, 765 N.W.2d at 272. We consider counsel's conduct under an objective standard of reasonableness under the circumstances—"that of a reasonably competent attorney admitted to practice before the district court." *Id.* (quoting *Weigel v. Weigel*, 467 N.W.2d 277, 281 (Iowa 1991)). Ignorance of the law or legal procedure is not an excuse because rule 1.413 "was designed to prevent abuse caused not only by bad faith but by negligence and, to some extent, professional incompetence." *Id.* at 273 (quoting *Perkins v. Gen. Motors Corp.*, 129 F.R.D. 655, 658 (W.D. Mo. 1990)).

We consider a variety of factors when evaluating the reasonableness of the signer's inquiry into the facts and law. *Id.* These factors include

> (a) the amount of time available to the signer to investigate the facts and research and analyze the relevant legal issues; (b) the complexity of the factual and legal issues in question; (c) the extent to which pre-signing investigation was feasible; (d) the extent to which pertinent facts were in the possession of the opponent or third parties or otherwise not readily available to the signer; (e) the clarity or ambiguity of existing law; (f) the plausibility of the legal positions asserted; (g) the knowledge of the signer; (h) whether the signer is an attorney or pro se litigant; (i) the extent to which counsel relied upon his or her client for the facts underlying the pleading, motion,

or other paper; (j) the extent to which counsel had to rely upon his or her client for facts underlying the pleading, motion, or other paper; and (k) the resources available to devote to the inquiries.

*Id.*

Application of these factors, here, reveals the district court should not have granted Retterath's motion for rule 1.413 sanctions. The arguments made by HES convinced the district court to award attorney fees. Although we discounted HES's arguments on appeal, they were made in good faith. Even though *NevadaCare* was decided prior to the ruling in this case, HES's argument that the indemnity provision under these facts was an attorney fee provision had some basis in fact. Accordingly, Retterath is not entitled to sanctions.

## XII. Disposition.

We affirm the district court's striking of Retterath's jury demand, bifurcation of the issues for trial, determination that membership approval of the MURA is not required under either HES's operating agreement or under Iowa law, denial of Retterath's motion for evidentiary sanctions or a continuance, determination that the MURA is a valid and binding agreement, determination that HES is entitled to specific performance as the remedy for Retterath's breach of the MURA, and rejection of Retterath's affirmative defenses. We reverse the district court's award of attorney fees to HES pursuant to section 4 of the MURA. We also find the district court's denial of Retterath's motion for sanctions under rule 1.413 was proper and determine that monetary sanctions are inappropriate.

We instruct the appellate clerk of court's office to tax fees and costs as follows: 80% to Steve Retterath, 10% to the intervenors (Jason and Annie Retterath), and 10% percent to HES.

**DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**